Pro Se 7 2023

```
_____FILED        _____ENTERED
_____LODGED       _____RECEIVED

        MAR 30 2026   LS

             AT SEATTLE
     CLERK U.S. DISTRICT COURT
  WESTERN DISTRICT OF WASHINGTON
BY                      DEPUTY
```

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

# 26-CV-01073-SKV

Shihwa Hwang-Meza _____

_____

_____.

                    **Plaintiff(s),**

    v.

Gates Foundation _____

_____

_____.

                    **Defendant(s).**

CASE NO. _____
[to be filled in by Clerk's Office]

COMPLAINT FOR EMPLOYMENT
DISCRIMINATION

Jury Trial: ☒ Yes   ☐ No

## I.    THE PARTIES TO THIS COMPLAINT

A.    Plaintiff(s)

*Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.*

| | |
|---|---|
| Name | Shihwa Hwang-Meza |
| Street Address | 3000F Danville Blvd. #267 |
| City and County | Alamo (Contra Costa) |
| State and Zip Code | CA, 94507 |
| Telephone Number | 408-410-8997 |

COMPLAINT FOR EMPLOYMENT DISCRIMINATION - 1

Pro Se 7 2023

B.    Defendant(s)

*Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title (if known). Attach additional pages if needed.*

Defendant No. 1

| | |
|---|---|
| Name | Gates Foundation |
| Job or Title *(if known)* | |
| Street Address | 500 5th Ave N. |
| City and County | Seattle (King) |
| State and Zip Code | WA, 98109 |
| Telephone Number | 206-709-3100 |

Defendant No. 2

| | |
|---|---|
| Name | |
| Job or Title *(if known)* | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |

Defendant No. 3

| | |
|---|---|
| Name | |
| Job or Title *(if known)* | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |

COMPLAINT FOR EMPLOYMENT DISCRIMINATION - 2

*Pro Se 7 2023*

Defendant No. 4

Name _____

Job or Title *(if known)* _____

Street Address _____

City and County _____

State and Zip Code _____

Telephone Number _____

C.    Place of Employment

The address at which I sought employment or was employed by the defendant(s) is:

| | |
|---|---|
| Name | Gates Foundation |
| Street Address | 500 5th Ave N. |
| City and County | Seattle (King) |
| State and Zip Code | WA, 98109 |
| Telephone Number | 206-709-3100 |

## II.    BASIS FOR JURISDICTION

This action is brought for discrimination in employment pursuant to *(check all that apply)*:

☒    Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (race, color, gender, religion, national origin).

*(Note: In order to bring suit in federal district court under Title VII, you must first obtain a Notice of Right to Sue letter from the Equal Employment Opportunity Commission.)*

☐    Age Discrimination in Employment Act of 1967, as codified, 29 U.S.C. §§ 621 to 634.

*(Note: In order to bring suit in federal district court under the Age Discrimination in Employment Act, you must first file a charge with the Equal Employment Opportunity Commission.)*

COMPLAINT FOR EMPLOYMENT DISCRIMINATION - 3

*Pro Se 7 2023*

☒    Americans with Disabilities Act of 1990, as codified, 42 U.S.C. §§ 12112 to 12117.
*(Note: In order to bring suit in federal district court under the Americans with Disabilities Act, you must first obtain a Notice of Right to Sue letter from the Equal Employment Opportunity Commission.)*

☒    Other federal law *(specify the federal law)*:

42 U.S.C. § 1981 (race discrimination in contractual employment rights)

_____

☒    Relevant state law *(specify, if known)*:

Washington Law Against Discrimination (RCW 49.60)

_____

☐    Relevant city or county law *(specify, if known)*:

_____

## III.    STATEMENT OF CLAIM

*Write a short and plain statement of the claim. Do not make legal arguments. State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought. State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.*

Plaintiff alleges discrimination, retaliation, and failure to accommodate.

See Attachment 1 for a detailed statement of facts and claims.

_____

A.    The discriminatory conduct of which I complain in this action includes *(check all that apply)*:

     ☐    Failure to hire me.

     ☒    Termination of my employment.

     ☐    Failure to promote me.

     ☒    Failure to accommodate my disability.

     ☒    Unequal terms and conditions of my employment.

COMPLAINT FOR EMPLOYMENT DISCRIMINATION - 4

Pro Se 7 2023

☒    Retaliation.

☐    Other acts *(specify)*: _____

B.    It is my best recollection that the alleged discriminatory acts occurred on date(s)

March 2021-September 2025

C.    I believe that defendant(s) *(check one)*:

☐    is/are still committing these acts against me.

☒    is/are not still committing these acts against me.

D.    Defendant(s) discriminated against me based on my *(check all that apply and explain)*:

☒    race            Biracial

☐    color

☐    gender/sex

☒    religion         Jewish

☐    national origin

☐    age *(year of birth)*       *(only when asserting a claim of age discrimination.)*

☒    disability or perceived disability *(specify disability)*

Medical condition causing physical impairment.

E.    The facts of my case are as follows. Attach additional pages if needed.

Plaintiff alleges discrimination, failure to accommodate, retaliation, and wrongful

Termination. See Attachment 1: Complaint for complete factual allegations.

_____

*(Note: As additional support for the facts of your claim, you may attach to this complaint a copy of your charge filed with the Equal Employment Opportunity Commission, or the charge filed with the relevant state or city human rights division.)*

COMPLAINT FOR EMPLOYMENT DISCRIMINATION - 5

*Pro Se 7 2023*

### IV.    EXHAUSTION OF FEDERAL ADMINISTRATIVE REMEDIES

A.    It is my best recollection that I filed a charge with the Equal Employment Opportunity Commission or my Equal Employment Opportunity counselor regarding the defendant's alleged discriminatory conduct on *(August 14, 2025)*

_____

_____

_____

B.    The Equal Employment Opportunity Commission *(check one)*:

☐    has not issued a Notice of Right to Sue letter.

☒    issued a Notice of Right to Sue letter, which I received on *(January 13, 2026)*

_____

*(Note: Attach a copy of the Notice of Right to Sue letter from the Equal Employment Opportunity Commission to this complaint.)*

C.    Only litigants alleging age discrimination must answer this question.

Since filing my charge of age discrimination with the Equal Employment Opportunity Commission regarding the defendant's alleged discriminatory conduct *(check one)*:

☐    60 days or more have elapsed.

☐    less than 60 days have elapsed.

### V.    RELIEF

*State briefly and precisely what damages or other relief the plaintiff asks the court to order. Do not make legal arguments. Include any basis for claiming that the wrongs alleged are continuing at the present time. Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts. Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages. Attach additional pages if needed.*

Plaintiff seeks back pay, front pay, lost benefits, compensatory and punitive damages, declaratory, and equitable relief, attorney's fees and costs. See Attachment 1 for full Prayer for Relief.

COMPLAINT FOR EMPLOYMENT DISCRIMINATION - 6

*Pro Se 7 2023*

## VI.    CERTIFICATION AND CLOSING

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:    03/30/2026

Signature of Plaintiff    _____

Printed Name of Plaintiff    Chihua Huang-Meza


Date of signing:    _____

Signature of Plaintiff    _____

Printed Name of Plaintiff    _____


Date of signing:    _____

Signature of Plaintiff    _____

Printed Name of Plaintiff    _____

COMPLAINT FOR EMPLOYMENT DISCRIMINATION - 7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

Shihwa Hwang-Meza,                                    Case No:

              Plaintiff,                              COMPLAINT FOR DAMAGES
                                                      AND DECLARATORY RELIEF

v.

Gates Foundation,

              Defendant.


**ATTACHMENT 1 – DETAILED COMPLAINT AND STATEMENT OF CLAIMS**

1

## I.    INTRODUCTION

1.  Plaintiff brings this action for discrimination, failure to accommodate, and retaliation arising from Defendant's pattern of conduct culminating in Plaintiff's termination and a coercive severance process designed to extinguish liability. Plaintiff asserts claims under Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), 42 U.S.C. § 1981, and the Washington Law Against Discrimination (WLAD), RCW 49.60.180.

2.  Plaintiff timely exhausted administrative remedies by filing a charge with the Equal Employment Opportunity Commission and commencing this action within ninety days of receipt of a Notice of Right to Sue (attached as Exhibit A) satisfying the requirements of 42 U.S.C. § 2000e-5.

3.  Plaintiff seeks declaratory relief that the separation agreement executed on September 10, 2025, is unenforceable because any purported waiver of statutory discrimination claims was not knowing and voluntary under governing federal law, and because the agreement was procured through fraud in the inducement, material omissions, and economic duress.

4.  Plaintiff further alleges that the arbitration provision, including any delegation clause assigning questions of arbitrability to the arbitrator, is independently unenforceable under generally applicable contract defenses, including fraud, procedural unconscionability, and lack of mutual assent, and therefore does not bar adjudication of Plaintiff's claims in this Court.

5.  Plaintiff alleges that Defendant engaged in a pattern of discriminatory and retaliatory conduct culminating in a pretextual termination and a coercive severance process designed to extinguish liability, including but not limited to: (a) the concealment of

2

comparator employee retention decisions during a purported reduction in force; (b) the inclusion of a materially false recital that Plaintiff had been afforded a 45-day consideration period; and (c) the withholding and timing of wage payments in a manner that increased economic pressure to execute the agreement.

## II.    JURISDICTION

6. This Court has original jurisdiction under 28 U.S.C. § 1331 because this action arises under the laws of the United States, including Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 et seq., and 42 U.S.C. § 1981.

7. This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over Plaintiff's claims arising under Washington law, including the Washington Law Against Discrimination, because those claims are so related to Plaintiff's federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

8. Plaintiff timely filed a charge of discrimination with the Equal Employment Opportunity Commission concerning the discriminatory and retaliatory conduct alleged herein, received a Notice of Right to Sue, and commenced this action within the time permitted by law. All conditions precedent to suit have been satisfied, excused, or otherwise discharged.

9. Venue is proper in the Western District of Washington under 42 U.S.C. § 2000e-5(f)(3) because the unlawful employment practices alleged herein were committed in this

District, the employment records relevant to those practices were maintained and administered in this District, and Plaintiff would have continued to work in this District but for Defendant's unlawful conduct.

10. Venue is also proper in this District under 28 U.S.C. § 1391(b)(1) and (2) because Defendant resides in this District and a substantial part of the events or omissions giving rise to the claims occurred in this District.

### III.    PARTIES

11. Plaintiff Shihwa Hwang-Meza is an individual residing in King County, Washington. Plaintiff was employed by Defendant from March 8, 2021, through September 14, 2025.

12. On July 16, 2025, Defendant informed Plaintiff that her position was being eliminated, and Plaintiff remained employed through a notice period ending September 14, 2025.

13. Defendant Gates Foundation ("Defendant" or "Foundation") is, on information and belief, a Washington nonprofit corporation with its principal place of business in Seattle, Washington. Plaintiff's employment and separation documents identify her employer as "Gates Foundation." At all relevant times, Defendant employed Plaintiff and controlled the terms, conditions, and privileges of her employment.

14. At all relevant times, Defendant was an employer within the meaning of 42 U.S.C. § 2000e(b), 42 U.S.C. § 12111(5)(A), and RCW 49.60.040, and a person subject to 42 U.S.C. § 1981.

4

## IV.    FACTUAL ALLEGATIONS

### A.  EMPLOYMENT AND PERFORMANCE

15. Plaintiff began employment with Defendant Gates Foundation (formerly Bill & Melinda Gates Foundation) on March 8, 2021, as a Program Manager (Cross-Cutting Programs) within the Human Resources department. Plaintiff held a senior, salaried, exempt role responsible for enterprise program management, including oversight of the Contingent Worker Program and the Parental Leave Program.

16. Plaintiff's role within the Human Resources department was limited to enterprise program management. Her responsibilities focused on program operations, policy implementation, and cross-functional coordination. Plaintiff did not perform employee relations functions, did not access or maintain personnel records, and did not participate in performance management, disciplinary actions, termination decisions, or workforce restructuring. Plaintiff did not draft, review, or administer separation agreements or other employment-related legal documents.

17. At the time of hire, Plaintiff had more than seven years of relevant professional experience and an advanced academic degree. Throughout her employment, Plaintiff performed the essential functions of her role successfully.

18. From 2021 through her termination in 2025, Plaintiff consistently met or exceeded Defendant's performance expectations. She maintained responsibility for high-impact, cross-functional initiatives throughout her tenure, including work supporting Foundation affiliates such as the Gates Medical Research Institute (GMRI) and Gates Agricultural Innovation (AgOne). Plaintiff received annual merit-based salary increases, with

5

compensation increasing from approximately $145,000 at hire to approximately $172,272 at termination. Plaintiff was never placed on a performance improvement plan, never formally disciplined, and Defendant did not identify performance deficiencies as a basis for any adverse action.

19. Beginning in January 2023, shortly after the conclusion of an external investigation into Plaintiff's prior workplace complaints in August 2022, Defendant assigned Plaintiff additional duties associated with the Human Resources Global Operations ("HRGO") team. These duties consisted primarily of high-volume transactional processing and helpdesk ticket resolution work typically performed by lower-band, non-exempt employees, and were materially different from Plaintiff's program management responsibilities.

20. Defendant assigned these duties without any change in title or compensation. Defendant's internal classifications identified the HRGO work as below Plaintiff's job band.

21. Despite this expanded workload, Plaintiff continued to perform at a high level. In 2023, Plaintiff resolved approximately 1,410 HRGO tickets with high satisfaction ratings. In 2024, Plaintiff resolved approximately 1,995 tickets, achieving one of the fastest resolution times on the team while maintaining high satisfaction scores.

22. At all times relevant to this action, Plaintiff remained qualified for her position and performed her job duties successfully.

## B. PROTECTED STATUS

23. Plaintiff is a member of multiple protected classes. Plaintiff identifies as a woman of two or more races and is therefore protected on the basis of race under Title VII of the Civil

Rights Act of 1964 and 42 U.S.C. § 1981. Plaintiff's racial identity, as reflected in her EEOC Charge (No. 551-2025-07070), includes her identification as biracial.

24. Plaintiff also practices the Jewish faith and holds sincerely held religious beliefs, placing her within a protected class on the basis of religion.

25. During her employment, Plaintiff developed a medical condition that substantially limited one or more major life activities. These impairments constitute a disability within the meaning of the Americans with Disabilities Act and the Washington Law Against Discrimination. Defendant had actual knowledge of Plaintiff's disability and approved workplace accommodations beginning in or about October 2021 which were continuously renewed through the end of the Plaintiff's employment.

26. Plaintiff also claims under the Washington Law Against Discrimination, RCW 49.60 et se., which prohibits discrimination on the basis of race, religion, disability, and marital status, among other protected characteristics. RCW 49.60.180. Plaintiff is single and therefore a member of a protected class on the basis of marital status under Washington law.

27. Defendant was aware of Plaintiff's protected statuses throughout her employment, including through Plaintiff's accommodation requests, communications regarding religious observance, and its direct knowledge of Plaintiff's race.

## C. PROTECTED ACTIVITY

28. Plaintiff engaged in protected activity by opposing conduct, which she reasonably believed to be unlawful discrimination and retaliation, and by participating in internal and external investigations concerning such conduct.

7

29. Plaintiff first engaged in protected activity on June 6, 2021, when she submitted a formal written complaint to Defendant's Chief Executive Officer alleging discrimination based on race, and religion, as well as related workplace misconduct. Defendant initiated an external investigation in response, and Plaintiff participated in that investigation through its conclusion in or about August 2022.

30. Plaintiff engaged in further protected activity on November 11, 2024, when she submitted a second formal written complaint alleging disability discrimination, failure to accommodate, religious discrimination, and retaliation. Defendant retained external counsel to investigate, and Plaintiff participated by providing information and attending interviews between November 2024 and March 2025.

31. In or about March 2025, Plaintiff submitted additional written complaints to senior leadership, including the Chief People Officer, reporting violations of her disability accommodations and other workplace conduct she reasonably believed to be unlawful. Plaintiff also participated in a mediation process initiated by Defendant in response to these complaints.

32. During her notice period, Plaintiff continued to engage in protected activity, including: (a) submitting a written complaint on August 7, 2025 alleging retaliation; (b) providing information to Defendant's investigator on or about August 13, 2025 concerning the reduction in force; (c) raising additional concerns regarding discrimination and retaliation on or about August 15, 2025; and (d) reporting potential compliance concerns to Defendant's legal department on or about August 18, 2025.

33. On September 14, 2025, Plaintiff submitted a formal report through Defendant's ethics and compliance reporting system concerning workplace conduct and compliance issues.

34. Defendant had actual knowledge of Plaintiff's protected activity. Plaintiff's complaints and disclosures were directed to senior leadership, human resources personnel, investigators, and legal counsel, and Defendant initiated investigations and other formal processes in response.

35. Following Plaintiff's protected activity, Defendant subjected Plaintiff to adverse employment actions as described below.

## D.  DISCRIMINATORY AND RETALIATORY ACTIONS

36. From the outset of Plaintiff's employment in 2021 through her termination in September 2025, Defendant engaged in a continuous and escalating pattern of discriminatory and retaliatory conduct directed at Plaintiff on the basis of her race, religion, disability, and protected activity.

37. This conduct began during the hiring process and continued through onboarding, job assignments, medical leave, return to work, internal complaints and investigations, and Plaintiff's termination and separation process.

### D1. Recruitment & Early Employment

38. In or about March 2021, prior to Plaintiff's start date, Defendant's executive recruiter asked Plaintiff whether she had misrepresented her United States citizenship during the hiring process and offered assistance with the background check if she had. Plaintiff is a native-born United States citizen.

39. During Plaintiff's first week of employment, her manager, Lucia Cote, asked Plaintiff where she was born, where she had been educated, and why she had studied abroad.

During an early meeting, Cote told Plaintiff: "I can help support you as you find a position outside the Foundation."

40. During onboarding, colleagues told Plaintiff she was "only a person of color" and had "no say here." Plaintiff also heard comments referencing Jewish and other religious identities during workplace discussions and DEI-related meetings.

41. In April 2021, after Plaintiff identified compliance irregularities in the Contingent Worker Program, Plaintiff was removed from full primary ownership of the program, although she continued performing duties relating to the program.

42. In April and May 2021, Plaintiff's manager told Plaintiff she "looked weird and strange," suggested she take extended leave, and stated that Plaintiff's physical illness appeared psychiatric in nature.

43. During this period, Plaintiff's manager questioned Plaintiff's fitness for employment while Plaintiff was experiencing a medical condition.

44. On May 21, 2021, Plaintiff sought assistance from the HR Director, Bindi Lassige, who informed Plaintiff her manager had done nothing wrong and stated: "We thought something had happened to you since you are alone," and "You could have been hurt/dead."

45. On June 6, 2021, Plaintiff submitted a written complaint to CEO Mark Suzman regarding workplace treatment and compliance concerns. Defendant initiated an external investigation.

46. Lassige departed the Foundation in or about June 2021.

47. Plaintiff went on medical leave shortly thereafter and participated in the investigation process. The investigation concluded in or about August 2022.

10

48. Plaintiff returned to work in October 2021 with approved disability accommodations, which Defendant acknowledged and documented.

49. Plaintiff's approved accommodations included: full-time remote work; limitations on meeting duration (generally 25–45 minutes with required breaks); periodic rest breaks during the workday; and protected uninterrupted work time. Plaintiff successfully performed all essential job functions under these accommodations.

50. Between October 2021 and July 2022, Plaintiff continued successfully performing her duties while working under her approved accommodations. During this period, Plaintiff re-launched the Contingent Worker Program, implemented structural improvements to program operations, and developed new documentation and systems to support program administration, including work supporting Foundation affiliates.

51. From August 2022 through January 2023, Defendant failed to maintain these accommodations, including by scheduling meetings exceeding the approved duration limits, failing to provide required breaks, and pressuring Plaintiff to attend in-person activities inconsistent with her remote-work accommodation.

**D2. Management Change & Breakdown of Disability Accommodations**

52. Bindi Lassige rejoined the Foundation on July 18, 2022, and became Plaintiff's direct manager.

53. At Plaintiff's first meeting with Lassige on July 28, 2022, Lassige stated she was "glad" Plaintiff's accommodations were expected to end on August 1, 2022. At that time, Plaintiff's accommodations—including remote work and limits on meeting duration and required breaks—had been approved and remained medically necessary.

11

54. From August 1, 2022, through January 2023, a period of approximately 5 months, Plaintiff's accommodations lapsed entirely despite having previously been approved and were not replaced or reinstated.

55. During this period, Plaintiff was pressured to attend in-person activities inconsistent with her accommodations, including a November 2022 HR retreat, and was told she was not considered part of the "team" because she did not attend in person, during a period when in-person attendance was optional.

56. During this same period, Lassige conducted seven 1:1 meetings with Plaintiff on August 30, September 13, September 28, October 10, October 25, November 7, and November 21, 2022. These meetings exceeded Plaintiff's accommodation limits by lasting longer than permitted and by failing to include required breaks.

57. On December 8, 2022, Lassige asked Plaintiff to provide temporary support to the HR Global Operations ("HRGO") function following the departure of an HRGO coordinator. The assignment was described as temporary and expected to require approximately five hours per week.

**D3. Retaliatory Expansion of Duties and Disproportionate Workload Assignment**

58. Beginning in January 2023, Defendant expanded Plaintiff's HRGO-related responsibilities beyond her existing role.

59. On January 3, 2023, Lassige informed Plaintiff that there were "no accommodations on file," despite Plaintiff's prior approved accommodations.

12

60. On the same day, Lassige required Plaintiff to receive approximately one hour of training for HRGO work, which included operational tasks typically performed by employees in lower job bands over her accommodation of no meetings lasting beyond 45 minutes.

61. During a January 30, 2023 performance discussion, Lassige told Plaintiff she should "rethink" her accommodations and stated that Plaintiff could not "have a successful HR career" without attending the office in person. Lassige also referenced Plaintiff's absence from a November 2022 in-person retreat.

62. Lassige instructed Plaintiff not to communicate with most HR colleagues because "your work doesn't overlap," limiting her collaboration within the department.

63. On February 14, 2023, after Plaintiff identified certain leave (Jewish holidays) as religious in nature, Lassige asked: "You don't really believe in all that stuff, do you?" Lassige approved the leave but characterized it as excessive.

64. In or about March 2023, Plaintiff sought assistance from HR Business Partner Director Brena Cole regarding these issues.

65. Cole informed Plaintiff that the Foundation was not required to provide religious PTO because the organization did not require documentation of religious belief.

66. On April 20, 2023, Lassige and HRGO Senior Manager Natalie Christensen met with Plaintiff regarding expansion of the HRGO assignment. A follow-up email dated April 21, 2023 confirmed that Plaintiff would assume increased and ongoing responsibility for HRGO contingent worker processing beginning August 1, 2023.

67. On April 27, 2023, Plaintiff raised concerns that the HRGO assignment fell outside her role. Lassige responded: "I made my decision, you're doing it."

13

68. These actions occurred after Plaintiff's prior complaints and requests for accommodation remained unresolved.

69. Plaintiff's accommodations were documented and renewed via an HR ticketing system starting in April 2023 through September 2025.

70. When Plaintiff inquired about compensation, HR Business Partner Cole confirmed that the HRGO work was classified below Plaintiff's job band and that no pay adjustment would be provided.

71. Plaintiff required additional sick leave in or about April 2023 related to her medical condition. During this period, a manager communicated to Human Resources that Plaintiff would be "on parental leave again." Plaintiff had not taken parental or pregnancy-related leave.

72. Plaintiff took medical leave in or about May 2023 and returned to work in or about June or July 2023.

73. After Plaintiff resumed work and later assumed HRGO responsibilities in September 2023, those responsibilities expanded substantially. By 2023, the HRGO work comprised approximately thirty-five percent of Plaintiff's time, increasing to approximately forty-five percent by 2024.

74. At or around the time Plaintiff assumed these duties, Defendant had identified or hired another HRGO coordinator, and the HRGO function was staffed. Despite this, Plaintiff was still required to perform substantial HRGO responsibilities that should have been performed by a lower-band HRGO coordinator.

75. The HRGO assignment materially altered the nature of Plaintiff's role by shifting a substantial portion of her time from strategic program management to high-volume transactional tasks typically performed by lower-band employees.

76. In the summer of 2023, Plaintiff temporarily lost her voice due to a medical condition and participated in meetings by typing as part of her accommodations.

77. During an August 9, 2023, performance review, Lassige stated: "I'm so glad your voice is out so you can't interrupt me," and "Maybe you won't have this issue in the future if your voice doesn't come back." Lassige also criticized Plaintiff's communication during that review.

78. Plaintiff continued performing her duties.

**D4. Pattern of Increasingly Hostile Environment**

79. By approximately January 2024, rumors circulated within Human Resources Global Operations, including among Senior Manager Christensen and members of the Talent team, that Plaintiff was pregnant and frequently absent from work.

80. These statements were made among Human Resources personnel responsible for employee relations and organizational support. During these discussions, Lassige stated that it was "possible" and suggested that Plaintiff may be pregnant.

81. Plaintiff was treated as if her absences were non-medical following the circulation of these statements.

82. On April 3, 2024, Plaintiff requested paid time off for May and October 2024. Lassige approved the May request but did not approve the October dates. When Plaintiff followed

15

up on April 23, 2024, Lassige told Plaintiff to "see how things go with HRGO" before confirming the October leave.

83. In or about April 2024, Plaintiff took bereavement leave following the death of her father. During this period, Plaintiff requested that HRGO perform transactional responsibilities. HRGO did not complete those tasks.

84. Upon Plaintiff's return, Lassige told Plaintiff she was "disappointed" and stated that the failures were Plaintiff's "fault." Lassige expressed frustration that Plaintiff had taken leave. Plaintiff took approximately five days of bereavement leave, consistent with company policy.

85. Between approximately May and June 2024, Plaintiff repeatedly requested approval for extended bereavement leave of up to thirty days under company policy. Lassige did not approve or respond to these requests.

86. Other employees within Human Resources, subject to the same bereavement policy and managerial approval structure, were granted extended bereavement leave or reduced workloads for non-immediate family members, including cousins and extended relatives including employees overseen by the same Human Resources leadership.

87. On July 14, 2024, Plaintiff informed Lassige that HRGO staff had failed to complete contingent worker terminations during the second quarter (April through June), resulting in a finance audit identifying approximately eleven late transactions. Lassige responded: "I expected you to have trained them beforehand." Plaintiff had previously trained HRGO staff and maintained documentation since August 2023.

88. At the July 29, 2024, mid-year performance review, Lassige told Plaintiff she had "received no complaints" and that everything was "all good."

16

89. During three consecutive one-on-one meetings in late July and August 2024, Lassige referenced Plaintiff's father's death in connection with the HRGO audit results. Lassige stated on multiple occasions that the issues would not have occurred if Plaintiff's father "did not pass away." Lassige also stated, "at least it's over and can't happen again," and told Plaintiff she would "get used to how things are now."

90. During this same period, Lassige instructed Plaintiff to empty her mailbox and stated she did not want "that type of mail here." Lassige's assistant later forwarded photographs of Plaintiff's mail without Plaintiff's knowledge. The mail included correspondence associated with Jewish organizations, including the Anti-Defamation League.

91. On August 26, 2024, Plaintiff again raised her pending October PTO request and her request for extended bereavement leave. Lassige responded that HRGO performance had not gone "well," that Plaintiff "didn't train HRGO enough," and that Plaintiff should "stop blaming HRGO, because it's your fault." Lassige did not approve the requested leave.

92. On September 5, 2024, Plaintiff met with finance team member Brandi Kopinski regarding the audit findings. Kopinski stated that she had been informed Plaintiff had not trained HRGO staff "at all" and believed Plaintiff had been on "vacation" and "enjoying [herself]" during April. Plaintiff had been on bereavement leave during that time, and training documentation existed.

93. During one-on-one meetings on September 23 and October 7, 2024, Lassige stated that Plaintiff's Contingent Worker Program SharePoint site had been developed through their joint efforts. The site had been created by Plaintiff in March and April 2022, prior to Lassige's re-employment with the Foundation.

17

94. In those meetings, Lassige also stated that she could not recall whether Plaintiff had performed core job responsibilities, including stakeholder support, training, and record maintenance, which Plaintiff had performed continuously.

95. On October 7, 2024, Lassige directed Plaintiff to locate and forward an email immediately and to schedule a large group policy meeting "ASAP," tasks typically performed by administrative personnel. During the same meeting, Lassige stated that many HRGO coordinators had been "promoted" and that she did not want them to be "brought down" by performing work Plaintiff had "not trained them enough on again."

96. On October 11, 2024, during a group meeting, Lassige directed Plaintiff in front of stakeholders to "please find us time in December" and "follow up on the action steps ASAP."

97. Between July 29 and November 19, 2024, across at least nine documented one-on-one meetings and related communications, Lassige repeatedly assigned tasks characterized as requiring immediate or urgent action, including through the use of "ASAP" or equivalent directives. During this period, Plaintiff had approved disability accommodations requiring structured working time, including ten-minute breaks each hour, limitations on meeting duration, and approximately fifty percent uninterrupted work time.

98. On multiple occasions, these directives required Plaintiff to respond immediately, work beyond scheduled hours, and engage in real-time collaboration exceeding her documented limits, resulting in missed required breaks and disruption of her structured work schedule.

18

99.   Lassige issued these directives with knowledge of Plaintiff's accommodations, and without modification, adjustment, or engagement in any interactive process to ensure compliance with those limitations.

100.  These directives could have been scheduled or structured in a manner consistent with Plaintiff's documented accommodation limitations. The assigned tasks were not time-sensitive and were expected by stakeholders in the following quarter but were repeatedly communicated as requiring immediate or same-day completion.

101.  During this same period, Plaintiff's responsibilities expanded and included tasks typically assigned to lower-level roles, while Lassige simultaneously questioned or minimized Plaintiff's prior contributions.

**D5. Protected Complaint, External Investigation, and Employer Awareness**

102.  On November 5, 2024, Plaintiff commenced approved Short Term Disability leave. Plaintiff returned to work on November 15, 2024. On November 11, 2024, Plaintiff submitted a formal written complaint to CEO Mark Suzman describing concerns regarding disability accommodations, religious comments by her manager, HRGO workload assignments, and workplace conduct.

103.  On November 18, 2024, the Foundation retained Angela Vogel, a partner at Davis Wright Tremaine LLP, to conduct an external investigation into Plaintiff's complaint. Plaintiff participated in the investigation.

104.  Following her return from leave, Plaintiff asked to perform information technology tasks outside Plaintiff's primary role.

19

105. On November 21, 2024, Plaintiff met with Vogel for an interview. Plaintiff thereafter participated in additional interviews and provided documents requested during the investigation.

106. On December 16, 2024, during a meeting with Plaintiff, Lassige stated, "it hasn't been 45 minutes, we almost never meet," referencing the duration of the meeting. Plaintiff had previously submitted a formal complaint on November 11, 2024 concerning disability accommodations, including a 45-minute meeting limit. Plaintiff understood this statement to reflect Lassige's awareness of her complaint and accommodation. Plaintiff documented the comment and reported it to the external investigator.

107. On December 17, 2024, Plaintiff provided additional information to Vogel, including concerns relating to disability benefits and workplace conduct.

108. In or about December 2024 and January 2025, Plaintiff reported pregnancy-related rumors and related workplace comments to Vogel as part of the investigation.

109. Plaintiff explained that the rumors arose after her use of disability-related leave and contributed to the hostile treatment she experienced following accommodation requests.

110. Vogel informed Plaintiff she could not investigate these issues and indicated the conduct did not fall within sexual harassment.

111. On March 12, 2025, a meeting appeared on Plaintiff's calendar organized by Jennie Wyatt, Director of Legal. The meeting included Lassige, Foundation employment counsel Elliot Watson, and Plaintiff. No agenda was provided.

20

112. Prior to the meeting, Plaintiff contacted Vogel to confirm the status of the investigation. Vogel responded that the investigation remained open.

113. On March 13, 2025, the meeting occurred. The discussion concerned a California Employment Development Department audit relating to independent contractor classifications associated with Plaintiff's program responsibilities. Plaintiff had not previously been informed of the audit. Lassige arrived late and appeared upset. Plaintiff reported the meeting to Vogel.

114. On March 19, 2025, Plaintiff emailed Chief People Officer June Yoshinari Davis documenting concerns that Lassige instructed Plaintiff not to communicate directly with Davis regarding a policy matter and restricted Plaintiff's access to information requested by Davis.

**D6. Retaliatory Investigation Closure and Ineffective HR Mediation**

115. On March 20, 2025, Lassige scheduled a seventy-five-minute meeting despite Plaintiff's documented accommodation limiting meetings to no more than forty-five minutes.

116. During the March 20, 2025, meeting, while Plaintiff was presenting program updates, Lassige shouted "NO! STOP! BACK UP!" multiple times. Lassige raised her hand toward the camera, pulled at her hair, lowered her head toward her knees, and moved out of view of the camera. Plaintiff remained on the call and observed the conduct.

117. Following the meeting, Plaintiff emailed Chief People Officer June Davis describing the incident and stating she felt shaken by the interaction.

118. Davis responded by suggesting Plaintiff speak with Lassige or HR. Plaintiff replied noting the ongoing investigation. Davis referred the matter to Davis Wright Tremaine.

119. On March 21, 2025, Vogel informed Plaintiff that her role was limited to providing investigative findings and that she could not intervene in ongoing workplace matters.

120. On March 22, 2025, Plaintiff submitted a written complaint to CEO Suzman regarding the March 20th incident.

121. On March 23, 2025, Plaintiff submitted a second written complaint to Suzman describing the same incident and related concerns. Plaintiff noted that Foundation security had characterized the incident as a workplace morale matter. Plaintiff was not informed of any corrective action taken.

122. On March 24, 2025, Plaintiff emailed Lassige and copied Davis requesting that future meetings comply with her forty-five-minute accommodation limit.

123. On the same date, within approximately 48 hours of Plaintiff's written complaints to CEO Suzman, the Foundation closed the external investigation—after approximately four months (127 days)—with a finding of "not substantiated." Immediately following the investigation closure, HR Business Partner Sal Paredes initiated a mediation process between Plaintiff and Lassige at the request of Plaintiff.

124. On March 25 and March 26, 2025, Paredes communicated with Plaintiff regarding mediation preparation and requested written pre-work materials. Plaintiff provided the requested materials.

125. On March 31, 2025, Plaintiff informed Paredes that her physician had recommended voice rest for several weeks due to the recurrence of a vocal condition. Plaintiff also submitted requests for religious leave for April 2025.

22

126. On April 4, 2025, Plaintiff postponed a one-on-one meeting with Lassige and notified Paredes.

127. On April 11, 2025, Paredes provided a mediation preparation template and asked Plaintiff to focus discussions on future collaboration. Plaintiff agreed while noting the impact of prior events.

128. On April 18, 2025, Plaintiff confirmed accommodation parameters for the mediation session, including limits on meeting duration. Plaintiff proposed May 5, 2025, for the session.

129. On May 5, 2025, the mediation session took place involving Plaintiff, Lassige, and Paredes. Paredes documented three agreements and indicated that a follow-up meeting would occur later in the "summer." No follow-up session was scheduled.

130. Following the May 5, 2025, mediation session, Plaintiff continued to meet with Lassige regarding ongoing program responsibilities.

131. From May through July 2025, Plaintiff continued performing her Contingent Worker Program and HRGO responsibilities.

132. On July 14, 2025, Plaintiff met with Lassige for a performance review and to discuss planned changes to the Contingent Worker Program and upcoming operational work. Plaintiff was not informed during this meeting that her position was at risk or being eliminated.

### D7.  HR Restructure & Termination

133. On July 16, 2025, the Foundation notified Human Resources employees that individuals receiving calendar invitations that day were impacted by a restructuring.

23

Plaintiff received such a meeting invitation and was informed by Sal Paredes and Kelly Goff, an HR Director, that her position was being eliminated effective September 14, 2025.

134. At the time of this meeting, Paredes was actively serving as the facilitator of an ongoing internal mediation involving Plaintiff that had not concluded. A follow-up mediation session referenced in May 5, 2025, recap had not been scheduled. Plaintiff's assigned HR Business Partner, Lauren Hazard, did not attend the termination meeting.

135. During the meeting, Plaintiff was told that the decision was not based on performance. Plaintiff was instead told her skills were "not aligned" and that she was not considered "global." No criteria, competencies, evaluation framework, or examples were provided to support these statements, and no written selection criteria governing layoff decisions were identified.

136. At the time of the restructuring, the Foundation did not apply any documented performance rating system or standardized selection framework to determine which employees would be selected for layoff.

137. On July 17, 2025, the Foundation circulated an organizational chart during a People Team All-Hands meeting. That chart identified, within Kelly Goff's team, a role titled "Senior Program Manager, Cross-Cutting Programs," assigned to Keena Kaye and designated as newly created.

138. Following the termination notice, Plaintiff was directed to transition her programs and operational processes. Beginning on or about August 4, 2025, Plaintiff transferred these responsibilities to Ms. Kaye, who stated she would assume ownership of those

same program areas. Plaintiff continued to perform substantive work, including maintaining program deliverables and covering program responsibilities during Ms. Kaye's absence from August 11 through August 15, 2025.

139. An email sent after the July 17, 2025, meeting identified 16 individuals as terminated or impacted by the restructuring.

140. At the time of the restructuring and through the end of her employment, Plaintiff understood that certain identified employees, including Carly Mattson and Sue Wallace, had been selected for termination. Plaintiff was not informed of any exceptions, reconsideration process, individualized review, or criteria governing retention or reassignment decisions. Plaintiff only later learned, after her separation from employment, that one or more individuals initially identified as impacted were retained or reassigned to other roles.

141. Plaintiff further learned after her separation that at least one employee initially considered for layoff was removed from the layoff decision-making process due to personal circumstances. Plaintiff was not informed that individualized exceptions of this nature were being made, nor that such considerations were applied in the selection process.

142. Lindsey Mollenholt was retained and placed into a newly created role titled "Regional Deputy Director, HR Business Partner, UK and EMEO" within the reorganized structure. The position was not publicly posted, and no competitive application process was disclosed. At the time of the restructuring, Mollenholt held the same job band as employees selected for layoff.

143. During the same restructuring, additional roles were created within the Human Resources function. Plaintiff was not provided with any opportunity to apply for newly created roles prior to her separation.

144. Defendant represented that impacted employees lacked the necessary skills for newly created roles, yet reassigned similarly situated employees outside Plaintiff's protected classes without a competitive process.

145. Employees in other departments, including Legal, who were impacted by contemporaneous restructuring were provided with extended transition periods and opportunities to apply for other roles. Plaintiff was not provided comparable transition time or access to internal opportunities.

146. The work performed by Plaintiff prior to July 16, 2025, continued after the restructuring and was reassigned in whole or in part to other employees.

147. Although Defendant represented that Plaintiff's position was eliminated as part of the restructuring, Plaintiff's core program responsibilities continued following the restructuring and were reassigned in whole or substantial part to retained employees, including Keena Kaye, supporting an inference that Plaintiff's role was not in fact eliminated.

**D8. Notice Period & Internal Investigation into Restructure**

148. On August 5, 2025, Plaintiff met with Chief People Officer June Davis to discuss the restructuring. During that meeting, Plaintiff raised that her termination occurred while mediation remained open and identified the sequence of events as retaliatory.

149. Davis acknowledged that mediation follow-up had not occurred but did not identify any corrective action or reconsideration of the termination decision.

150. During the same meeting, Davis confirmed that certain employees in the Legal department had received extended transition periods but described those instances as exceptions without identifying any criteria governing those determinations.

151. Davis also stated that newly created roles were not aligned with prior roles of impacted employees, while other employees had been placed into new roles without a competitive process.

152. Davis informed Plaintiff that she and Sal Paredes participated directly and substantially in the layoff selection decisions. Davis did not identify any structured decision-making framework, written criteria, or all individuals involved in those decisions. Based on the information available to Plaintiff, Davis and Paredes exercised primary or substantial responsibility over the selection of employees for termination.

153. At the time these restructuring decisions were made, the individuals involved in the decision-making process, including Davis and Paredes, had direct knowledge of Plaintiff's prior protected complaints, her participation in internal investigations, and the ongoing mediation process involving Plaintiff.

154. On August 7, 2025, Plaintiff submitted a written complaint to CEO Mark Suzman stating that her termination was related to her prior complaints, participation in investigations, and mediation activity, and requesting review and resolution.

155. Following this communication, the Foundation opened a new additional investigation through Angela Vogel on August 13, 2025.

156. At that meeting, Plaintiff provided a reconstructed dataset of more than eighty United States-based Human Resources employees, identifying each individual's reduction-in-force status and demographic characteristics.

157. Plaintiff's dataset included approximately eighty U.S.-based Human Resources employees and identified retention disparities by race and marital status consistent with EEOC adverse impact analysis. The data showed materially lower retention rates for non-white and single employees compared to white and married employees.

158. Based on that dataset, non-white employees were selected for layoff at a higher rate than white employees, and non-white employees were placed into retained roles at a lower rate than white employees within the reorganized structure.

159. Plaintiff also identified that single employees were disproportionately selected for layoff compared to married employees.

160. On August 13, 2025, Plaintiff also reported a financial irregularity involving a transaction associated with the Contingent Worker Program that lacked supporting contractual documentation.

161. On August 15, 2025, the Foundation informed Plaintiff that it would no longer require her to perform work duties effective immediately, while maintaining her payroll status through September 14, 2025. This directive was issued before any separation agreement was presented and while internal investigations involving Plaintiff remained open.

162. On August 15, 2025, Plaintiff sent a written communication to CEO Mark Suzman and senior HR leadership asserting concerns of retaliation, discrimination, and ongoing procedural irregularities, and requesting that the Foundation engage in

28

discussions to resolve her separation. The communication followed Plaintiff's participation in the Foundation's internal investigation on August 13, 2025, and expressly referenced her prior protected activity, including her discrimination complaint and ongoing mediation process. Senior leadership received this communication on the same day that Plaintiff was informed her job duties would end immediately.

163. Plaintiff made this request out of concern that she would not be provided fair separation terms consistent with other employees affected by the restructuring.

164. On the same day, a transition meeting was scheduled by Ms. Kaye to facilitate transfer of Plaintiff's responsibilities.

165. Plaintiff continued to engage in internal complaints and investigative processes during the notice period, including providing information relating to workforce demographics and internal program activity. The Foundation, through its leadership, legal, and investigative personnel, had contemporaneous knowledge of these activities.

### D9. Protected Activity During Notice Period

166. Beginning in or about August 2025, during Plaintiff's notice period, Plaintiff's medical condition materially worsened, increasing her functional limitations and dependence on continued income and health coverage.

167. On August 18, 2025, Defendant, through Deputy Director of Legal–Employment Adam Tullman, initiated separation discussions, presented a severance framework, and represented that he was authorized to resolve the matter and would serve as

Plaintiff's sole point of contact. Plaintiff reasonably understood that all communications and negotiations were required to proceed exclusively through Tullman.

168. That same day, Plaintiff disclosed significant compliance concerns, including a financial irregularity of approximately $240–248 million to be paid to UNICEF, involving Defendant's contingent worker program and involving Lassige. Plaintiff had previously disclosed related concerns to an external investigator on August 13, 2025.

169. On or about August 20, 2025, Plaintiff participated in a meeting with Tullman, lasting approximately fifteen minutes. During that meeting, Tullman described the separation agreement as "standard" and "boilerplate" and did not explain the arbitration provision, delegation provision, or non-disparagement provision.

170. On August 20, 2025, Plaintiff participated in a brief meeting with Tullman. During that meeting, Tullman characterized the separation agreement as "standard" and "boilerplate" and did not explain that the agreement required arbitration of statutory discrimination and retaliation claims, waived the right to a judicial forum and jury trial, or delegated questions of enforceability to a private arbitrator. Tullman did not correct Plaintiff's reasonable understanding that any dispute resolution provision applied only to post-separation contractual matters such as confidentiality or non-disparagement.

171. Tullman further represented that investigations into Plaintiff's complaints would continue and that Plaintiff would be informed of the outcome. At all relevant times

prior to execution, those investigations remained open, and no findings, timelines, or material information were disclosed to Plaintiff.

172. During negotiations, Defendant sought to advance Plaintiff's separation date to August 31 or September 1, 2025, thereby conditioning severance on execution of the agreement within a shortened and uncertain timeframe. This created time pressure and risk of earlier loss of employer-sponsored health insurance, which was material given Plaintiff's worsening medical condition and the cost and delay associated with COBRA continuation coverage.

173. During this same period, Plaintiff became aware that external investigator Angela Vogel and Tullman had a preexisting professional relationship through their respective law firm affiliations and prior work involving Defendant. Plaintiff understood that Vogel and Tullman "knew each other well," and had worked together professionally.

174. On August 22, 2025, Defendant transmitted a revised draft agreement describing it as "mostly boilerplate" and non-negotiable as to compensation. The draft incorporated the accelerated separation date and reduced the effective time available for review.

175. The agreement contained a provision stating that disputes regarding the scope of the release would be decided by an arbitrator. This provision was not labeled as a delegation clause, was not included in the arbitration section, contained no heading or cross-reference, and appeared within the general release provisions in a manner that reasonably read as a limitation on the release rather than a transfer of authority from a court to an arbitrator. No arbitration rules were provided, and no separate assent to delegation was obtained.

31

176. On or about August 26, 2025, Plaintiff provided proposed redlines to the draft agreement primarily focused on reducing potential financial liability arising from the agreement's confidentiality, non-disparagement, and damages provisions. Plaintiff was particularly concerned about provisions that could result in substantial financial exposure, including provisions that could require repayment of severance benefits or imposing significant monetary penalties in the event of an alleged breach. Plaintiff's proposed revisions therefore focused on reducing potential repayment obligations, limiting liquidated damages, and adding cure provisions to mitigate financial risk.

177. Plaintiff's negotiations during this period were focused on addressing these perceived financial risks rather than modifying the agreement's dispute resolution structure. Plaintiff did not propose revisions to the arbitration provisions or the provision stating that disputes regarding the scope of the general release would be determined by an arbitrator because Plaintiff did not understand those provisions to affect her ability to pursue statutory claims or to determine whether the agreement itself was enforceable. That provision was not identified to Plaintiff as having that effect during negotiations

178. Between August 25 and August 27, 2025, Plaintiff sought clarification regarding the agreement, but Defendant failed to provide substantive responses and did not identify any alternative contact, leaving Plaintiff without meaningful access to information necessary to evaluate the agreement.

179. On August 28, 2025, Defendant introduced, for the first time, a provision requiring return or destruction of information relating to other employees. This provision had not appeared in prior drafts and was introduced after Plaintiff's August 13, 2025, disclosure of demographic data and her August 18 disclosure of financial concerns.

180. On August 29, 2025, Plaintiff raised concerns regarding the newly introduced return-of-information provision and other material terms in a written communication to Defendant's Chief Executive Officer.

181. On August 29, 2025, Tullman revised the proposed termination date back to September 14, 2025.

182. On September 2, 2025, Tullman responded to certain redlines Plaintiff had submitted on August 26, 2025, but declined to address or accept several material revisions. Among the unresolved issues, Defendant refused Plaintiff's request for a mutual non-disparagement provision binding the Foundation's leadership and agents. Plaintiff's request for reciprocity was particularly material given that Plaintiff had been subject to false statements and rumors in the workplace — including false statements regarding her personal circumstances — during her employment. Defendant also declined to meaningfully reduce liquidated damages or repayment provisions, leaving in place terms that exposed Plaintiff to substantial financial liability. These provisions were central to Plaintiff's negotiations to mitigate financial risk.

183. Between September 2 and September 4, 2025, Plaintiff transmitted additional counterproposals, including her personal email due to irregularities in her work email system. Certain communications were received by Defendant but did not appear in Plaintiff's work account. Plaintiff opened IT Ticket 582978 but did not receive a technical explanation or resolution, impairing Plaintiff's ability to engage in reliable and complete negotiations.

184. On September 5, 2025, Defendant transmitted the final agreement via DocuSign, representing that Plaintiff had forty-five days to review it. In practice, however,

33

Plaintiff executed the separation agreement (attached as Exhibit B) on September 10, 2025—approximately five days later—under circumstances involving ongoing pressure, unresolved negotiations, and lack of material information.

185. Prior to execution, Plaintiff had been relieved of duties effective August 15, 2025, while negotiations were ongoing and investigations remained open. At the time of execution: (a) Plaintiff's duties had been removed; (b) her job functions had been reassigned; (c) Defendant had not disclosed comparator treatment, including the retention or reassignment of similarly situated employees including Carly Mattson and Sue Wallace or the criteria used to determine which employees would be retained or reassigned; (d) Defendant had not disclosed that Plaintiff's job functions would continue; and (e) investigations into Plaintiff's protected complaints remained open and unresolved.

186. At the time Plaintiff executed the agreement, Defendant's internal investigation into Plaintiff's protected complaints remained open and unresolved. Plaintiff had received no findings, no timeline, and no access to the information necessary to assess the strength or value of her claims yet was required to execute a comprehensive release covering those same claims.

187. The agreement was executed on behalf of Defendant by Kelly Goff, Director of People Experience. Plaintiff was not informed during negotiations that a Human Resources executive would approve or execute the agreement and learned of Goff's involvement only after execution, depriving Plaintiff of the opportunity to seek clarification from the appropriate decision-making authority.

34

188.  Throughout negotiations, Plaintiff reasonably understood that communications were confined to Defendant's legal department based on Tullman's representation that he was the sole point of contact. The absence of access to Human Resources or other decision-makers further limited Plaintiff's ability to obtain material information and negotiate terms.

189.  After execution, Plaintiff learned that employees identified as impacted by the restructuring had been retained or reassigned and that Plaintiff's job functions continued following her separation.

190.  On September 14, 2025, Plaintiff submitted a report through Defendant's Ethics Point system concerning the previously disclosed $248 million financial irregularity.

191.  Plaintiff's employment with Defendant ended on September 14, 2025.

192.  After execution of the Separation Agreement, Defendant failed to pay Plaintiff's final earned wages as required under Section 2.1 of the agreement. Plaintiff remained on payroll through September 14, 2025, during her notice period, and her final earned wages included regular salary covering September 11 through September 14, 2025. Although these wages were due on Defendant's next regular payroll date of September 15, 2025. Plaintiff raised the issue of the missing wages with Defendant's counsel on or about September 15, 2025. Plaintiff did not receive payment until September 30, 2025, approximately fifteen days after they became due.

193.  On September 15, 2025, Plaintiff commenced Washington Paid Family and Medical Leave due to a serious health condition and remained on leave through January 31, 2026.

194. As a result of her worsening condition and separation from employment, Plaintiff has not secured subsequent employment, despite reasonable efforts to obtain comparable work.

## V.    CLAIMS FOR RELIEF

**COUNT I — Title VII of the Civil Rights Act of 1964,  Race Discrimination — Disparate Treatment,  (42 U.S.C. §§ 2000e et seq.)**

195. Plaintiff realleges and incorporates by reference each of the preceding paragraphs as though fully set forth herein.

196. Plaintiff is a member of a protected class based on race.

197. Plaintiff was qualified for her position and performed her job duties satisfactorily throughout her employment.

198. On July 16, 2025, Defendant informed Plaintiff that her position was being eliminated as part of a restructuring and that her employment would terminate effective September 14, 2025. This constituted an adverse employment action.

199. The circumstances surrounding Defendant's decision give rise to an inference of racial discrimination.

200. Defendant represented that Plaintiff's role was eliminated, yet Plaintiff's core duties and program responsibilities were reassigned to another employee. Plaintiff was also

36

required to transition those same responsibilities to that employee during her notice period.

201. At the time of the restructuring, Defendant did not apply documented or consistently applied selection criteria and did not provide Plaintiff with any objective basis for her selection.

202. Defendant treated similarly situated employees outside Plaintiff's protected class more favorably, including by retaining or reassigning employees who were initially identified as impacted by the restructuring and by placing other employees into newly created or restructured roles without a competitive process. For example, Keena Kaye and Lindsey Mollenholt, both of whom are white and married and therefore outside Plaintiff's protected racial and marital status classes, were retained or placed into roles following the restructuring, while Plaintiff, who is biracial and single, was terminated.

203. Defendant did not disclose these comparator retention and reassignment decisions to Plaintiff during the restructuring or prior to execution of the separation agreement.

204. Defendant's restructuring process relied on discretionary decision-making, including individualized exceptions and post hoc role placements, which resulted in unequal treatment of employees.

205. Following the termination decision, Defendant removed Plaintiff's work duties during the notice period while continuing to require transition of her programs, further demonstrating that Plaintiff's role was not in fact eliminated.

206. Defendant's stated reasons for Plaintiff's termination, including that her skills were "not aligned" or that she was "not global," were vague, subjective, and not supported by any documented evaluation framework.

207. These circumstances, including the reassignment of Plaintiff's duties, differential treatment of similarly situated employees, lack of objective criteria, and inconsistencies in Defendant's stated rationale, support a plausible inference that Defendant's stated reason for termination was pretextual and that race was a motivating factor in the decision.

208. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered damages including lost wages, lost benefits, lost future earnings, and emotional distress.

**COUNT II — Title VII of the Civil Rights Act of 1964,  Race and National Origin Discrimination — Disparate Impact,  (42 U.S.C. §§ 2000e et seq.)**

209. Plaintiff realleges and incorporates by reference all preceding paragraphs.

210. Defendant implemented a reduction in force in or about July 2025 that functioned as a specific employment practice within the meaning of Title VII.

211. That reduction in force was carried out through a discretionary and subjective decision-making process that did not rely on standardized, objective, or consistently applied criteria.

212. The challenged practice included, among other things: (a) selecting employees for termination without articulated or consistently applied criteria; (b) retaining or

reassigning selected employees through undisclosed exceptions; (c) placing employees into newly created or restructured roles without posting or competitive process; and (d) failing to disclose comparator retention or reassignment decisions during the restructuring.

213. This discretionary system of decision-making constituted a facially neutral employment practice.

214. As implemented, the challenged practice disproportionately affected non-white employees.

215. Based on a dataset of more than eighty Human Resources employees involved in the restructuring, non-white employees were selected for layoff at a higher rate than white employees and were retained or placed into roles at a lower rate than white employees.

216. As described in paragraphs 156-159, Plaintiff's reconstruction of the U.S. Human Resources workforce, the July 2025 reduction in force shows statistically significant disparities. White employees had a retention rate of approximately 89.4% (59 of 66), while employees identifying as Two or More Races had a retention rate of 50% (1 of 2), Asian employees 66.7% (2 of 3), Hispanic employees 66.7% (4 of 6), and Black employees 66.7% (2 of 3). Each of these groups fell below the EEOC's four-fifths rule, a commonly accepted indicator of adverse impact, compared to white employees.

217. Plaintiff's analysis further showed that married or divorced employees had a retention rate of approximately 85.4% (70 of 82), while single employees had a retention rate

of approximately 71.4% (5 of 7), also reflecting disparity under Washington law protections for marital status.

218. These disparities were substantial and reflect materially unequal employment outcomes.

219. Plaintiff was subject to the challenged employment practice and was selected for termination as part of the reduction in force.

220. The disparities described above were caused by Defendant's use of subjective, discretionary decision-making and the absence of objective, consistently applied criteria in the restructuring process.

221. The disparity was of a magnitude sufficient to materially alter selection outcomes across the affected workforce.

222. Defendant's challenged practices were not job-related and were not consistent with business necessity.

223. Alternative practices were available that would have served Defendant's legitimate business interests with less discriminatory effect, including the use of objective selection criteria, transparent restructuring standards, and competitive processes for newly created roles.

224. As a direct and proximate result of Defendant's conduct, Plaintiff suffered loss of employment, lost wages and benefits, lost future earnings, and emotional distress.

**COUNT III — Religious Discrimination and Failure to Accommodate, (Title VII, 42 U.S.C. §§ 2000e et seq.; WLAD, RCW 49.60.180)**

225. Plaintiff realleges and incorporates by reference all preceding paragraphs.

226. Plaintiff is a practicing Jewish individual who holds sincerely held religious beliefs requiring observance of Jewish holidays, including the need for time off and scheduling accommodations.

227. Defendant was aware of Plaintiff's religious beliefs and practices throughout her employment, including through Plaintiff's requests for leave, communications regarding religious observance, and interactions with management and Human Resources.

228. Following the death of Plaintiff's father, Plaintiff requested bereavement leave under Defendant's policies, including extended leave. Defendant delayed or failed to approve the requested leave, criticized Plaintiff for taking leave, and attributed workplace issues to her absence. During the same period, similarly situated employees outside Plaintiff's religion were granted extended bereavement leave or workload adjustments under the same policy and management structure.

229. Plaintiff requested reasonable accommodations for her religious practices, including time off for religious observances and scheduling flexibility.

230. Defendant denied, delayed, or failed to reasonably accommodate Plaintiff's religious practices and failed to engage in a meaningful, good-faith process to provide such accommodations.

41

231. Defendant, through Plaintiff's manager, questioned the legitimacy of Plaintiff's religious beliefs and characterized her religious observance as excessive in response to her requests for leave for Jewish holidays.

232. Defendant, through Human Resources personnel, informed Plaintiff that Defendant was not required to provide religious accommodations, and acted consistent with that position.

233. Defendant subjected Plaintiff to differential treatment based on her religion, including scrutiny, skepticism, and negative commentary regarding her religious practices, that was not imposed on similarly situated employees outside Plaintiff's religion.

234. Following Plaintiff's requests for religious accommodation and related complaints, Defendant subjected Plaintiff to adverse actions, including increased scrutiny, negative treatment by management, and selection for termination as part of a reduction in force.

235. Plaintiff's religion and her requests for religious accommodation were motivating factors in Defendant's decision-making and adverse actions.

236. Defendant's conduct altered the terms, conditions, and privileges of Plaintiff's employment.

237. Defendant failed to provide reasonable accommodation for Plaintiff's religious practices without demonstrating undue hardship.

238. Defendant's conduct constitutes discrimination on the basis of religion and failure to accommodate in violation of Title VII, 42 U.S.C. § 2000e-2(a) and § 2000e(j).

239. Defendant's conduct further constitutes an unfair employment practice in violation of the Washington Law Against Discrimination, RCW 49.60.180.

42

240. As a direct and proximate result of Defendant's conduct, Plaintiff suffered loss of employment, lost wages and benefits, emotional distress, and other compensable damages.

**COUNT IV — Retaliation, (Title VII, 42 U.S.C. § 2000e-3(a); ADA, 42 U.S.C. § 12203; 42 U.S.C. § 1981; WLAD, RCW 49.60.210)**

241. Plaintiff realleges and incorporates by reference all preceding paragraphs.

#### A. Protected Activity

242. Plaintiff engaged in protected activity by opposing conduct she reasonably believed to constitute unlawful discrimination and retaliation, and by participating in related investigations, including but not limited to: (a) her June 6, 2021 written complaint to the Chief Executive Officer alleging discrimination based on race, religion, and disability; (b) her participation in the resulting investigation through approximately August 2022; (c) her November 11, 2024 written complaint alleging disability discrimination, failure to accommodate, religious discrimination, and retaliation; (d) her participation in the investigation from November 2024 through March 2025; and (e) additional written complaints and disclosures through September 2025 concerning discrimination, retaliation, and compliance-related concerns.

243. Defendant had actual knowledge of Plaintiff's protected activity, including through direct receipt of complaints and the retention of outside counsel to investigate them.

### B. Materially Adverse Actions

244. Following Plaintiff's protected activity, Defendant subjected Plaintiff to materially adverse actions, including but not limited to: (a) assigning Plaintiff substantial duties outside her role and job band without additional compensation; (b) subjecting Plaintiff to increased scrutiny, criticism, and pressure to curtail or abandon accommodations; (c) failing to honor Plaintiff's documented accommodations, including requiring participation in meetings exceeding medical limitations; (d) diminishing and reassigning Plaintiff's core job responsibilities; (e) terminating Plaintiff's employment (decision July 16 2025, effective September 14 2025) while her complaints, investigation, and mediation processes remained ongoing; and (f) imposing additional burdens and constraints during the separation and severance process.

245. These actions, individually and collectively, would dissuade a reasonable employee from engaging in protected activity.

### C. Causation

246. The facts alleged give rise to a plausible inference that Defendant acted because of Plaintiff's protected activity, including: (a) close temporal proximity between Plaintiff's protected activity and the onset and escalation of adverse treatment; (b) a pattern of progressively adverse actions following each instance of protected activity;(c) Defendant's knowledge of Plaintiff's protected activity at all relevant times; (d) the timing of Plaintiff's termination during and shortly after her participation in the 2024–2025 while mediation and internal complaint processes

44

remained ongoing; and (e) terminating Plaintiff's employment (decision July 16, 2025, effective September 14, 2025) while her complaints, investigation, and mediation processes remained ongoing

247. Defendant's retaliatory motive was a but-for cause of the adverse actions taken against Plaintiff. The proximity of these events, including Defendant's decision to terminate Plaintiff while protected investigations and mediation remained active, supports a reasonable inference of retaliatory motive.

### D. Violation and Damages

248. Defendant's conduct constitutes unlawful retaliation in violation of Title VII, the ADA, and the Washington Law Against Discrimination, each of which prohibits adverse action because an employee opposes unlawful practices or participates in protected proceedings. 42 U.S.C. § 2000e-3(a); 42 U.S.C. § 12203; RCW 49.60.210.

249. Defendant also interfered with Plaintiff's contractual employment rights on a retaliatory basis in violation of 42 U.S.C. § 1981.

250. As a direct and proximate result of Defendant's retaliatory conduct, Plaintiff suffered loss of employment, lost wages and benefits, loss of future earnings, and emotional distress.

**COUNT V — Americans with Disabilities Act of 1990, Disability Discrimination and Failure to Accommodate, (42 U.S.C. §§ 12101 et seq.)**

251. Plaintiff is a qualified individual with a disability within the meaning of the ADA. Plaintiff has physical impairments that substantially limit one or more major life activities. Defendant had actual knowledge of Plaintiff's disability.

252. Beginning in or about October 2021, Defendant approved workplace accommodations for Plaintiff, including remote work, limits on meeting duration, and structured scheduling.

253. With these accommodations, Plaintiff successfully performed the essential functions of her position.

254. Plaintiff remained qualified to perform her position with reasonable accommodation at all relevant times.

255. In or about August 2022, Defendant allowed Plaintiff's accommodations to lapse, accommodations were documented and renewed from April 2023 through September 2025, and thereafter failed to honor them. Defendant required in-person attendance, scheduled meetings exceeding Plaintiff's documented limitations, and pressured Plaintiff to discontinue accommodations.

256. Despite repeated requests and notice of her limitations, Defendant failed honor documented HR-approved accommodations.

257. On March 20, 2025, Defendant scheduled a seventy-five-minute meeting in direct conflict with Plaintiff's accommodation limiting meetings to forty-five minutes.

Plaintiff reported the violation in writing, and Defendant did not take corrective action.

258. Defendant subjected Plaintiff to adverse employment actions because of her disability and need for accommodation, including increased scrutiny, assignment of duties inconsistent with her role and termination decision on July 16 2025 and termination effective September 14 2025.

259. As a direct and proximate result of Defendant's conduct, Plaintiff suffered lost compensation, lost benefits, and emotional distress.

**COUNT VI — Americans with Disabilities Act (ADA) Retaliation, (42 U.S.C. §§ 12101 et seq.; 42 U.S.C. § 12203)**

260. Plaintiff realleges and incorporates by reference all preceding paragraphs.

261. Defendant retaliated against Plaintiff for engaging in protected activity under the ADA, including requesting reasonable accommodations, reporting failures to accommodate, and opposing disability discrimination.

### A. Protected Activity

262. Plaintiff engaged in protected activity throughout her employment, including: (a) requesting and receiving reasonable accommodations beginning in or about October 2021; (b) renewing, enforcing, and seeking continuation of those accommodations; (c) reporting violations of her accommodations, including meetings exceeding medically required limits and failures to honor approved restrictions; (d) submitting

47

written complaints to senior leadership alleging disability discrimination and failure to accommodate; (e) participating in internal and external investigations concerning disability-related conduct; and (f) raising ongoing concerns regarding accommodation violations during her employment and notice period.

## B. Adverse Actions

263.   Following this protected activity, Defendant subjected Plaintiff to materially adverse actions, including: (a) assigning Plaintiff a substantial volume of lower-band, non-managerial HRGO work inconsistent with her role; (b) subjecting Plaintiff to repeated pressure to discontinue or reduce her accommodations; (c) failing to maintain or honor approved accommodations, including by scheduling meetings exceeding documented limitations; (d) increasing scrutiny and negative treatment following accommodation-related complaints; (e) terminating Plaintiff's employment on July 16, 2025 while her complaints and mediation remained ongoing; and (f) removing Plaintiff's job duties and imposing additional burdens during the notice and severance process.

264.   These actions were materially adverse and would deter a reasonable employee from engaging in protected activity.

## C. Causation

265.   Plaintiff's protected activity was the but-for cause of Defendant's adverse actions. This causal connection is supported by: (a) temporal proximity between Plaintiff's protected activity and adverse actions, including actions occurring shortly after

complaints and accommodation requests; (b) a pattern of escalating adverse treatment following Plaintiff's protected activity; (c) Defendant's knowledge of Plaintiff's protected activity; (d) decisionmaker conduct reflecting hostility toward Plaintiff's accommodations; and (e) terminating Plaintiff's employment (decision July 16, 2025, effective September 14, 2025) while her complaints and mediation remained ongoing.

## D. Legal Violations

266. Defendant's conduct constitutes unlawful retaliation in violation of the ADA, including 42 U.S.C. § 12203, which prohibits discrimination against an individual because she opposed unlawful practices or participated in protected proceedings.

267. To state a claim, a plaintiff must plausibly allege protected activity, materially adverse action, and a causal link between the two.

268. An adverse action is any action that might dissuade a reasonable worker from engaging in protected activity.

269. Retaliation claims require but-for causation, which may be established through circumstantial evidence such as timing and pattern of conduct.

## E. Resulting Harm

270. As a direct and proximate result of Defendant's retaliatory conduct, Plaintiff has suffered lost wages, lost benefits, diminished earning capacity, and emotional distress.

**COUNT VII – Violation of 42 U.S.C. § 1981, Race Discrimination – Interference with Contractual Rights**

271. Plaintiff realleges and incorporates by reference all preceding paragraphs.

272. At all relevant times, Plaintiff had a contractual employment relationship with Defendant, including rights relating to compensation, job duties, performance, continued employment, and the terms, conditions, and privileges of employment.

273. Plaintiff is a member of a protected class based on race.

274. 42 U.S.C. § 1981 guarantees all persons the same right to make and enforce contracts as enjoyed by white citizens, including the performance, modification, and termination of employment relationships.

275. Defendant intentionally discriminated against Plaintiff on the basis of race in the performance and termination of her employment.

276. Defendant treated Plaintiff less favorably than similarly situated employees outside Plaintiff's protected class, including with respect to job duties, workload, opportunities for retention or reassignment, and termination decisions.

277. Defendant impaired Plaintiff's contractual rights through race-based conduct, including but not limited to: (a) removing and reassigning Plaintiff's core job duties and program ownership; (b) materially altering Plaintiff's role and responsibilities in a manner inconsistent with her position; (c) assigning Plaintiff substantial below-band operational work without additional compensation; (d) subjecting Plaintiff to inferior terms and conditions of employment; (e) denying Plaintiff equal opportunity to obtain or be placed into comparable roles made available to similarly situated employees

50

outside Plaintiff's protected class; (f) selecting Plaintiff for termination while retaining or reassigning similarly situated employees outside Plaintiff's protected class; and (g) representing that Plaintiff's role was eliminated while continuing those functions through reassignment to another employee.

278. Through this conduct, Defendant denied Plaintiff the full and equal benefit of her contractual relationship as enjoyed by employees outside her protected class.

279. Race was the but-for cause of Defendant's impairment of Plaintiff's contractual rights.

280. As a direct and proximate result of Defendant's conduct, Plaintiff suffered loss of employment, lost compensation and benefits, emotional distress, and other damages.

281. Defendant's conduct was intentional, willful, and carried out with reckless disregard of Plaintiff's federally protected rights.

282. WHEREFORE, Plaintiff requests all relief available under 42 U.S.C. § 1981, including compensatory damages, punitive damages, equitable relief, costs, and such other relief as the Court deems just and proper.

**COUNT VIII — Washington Law Against Discrimination (WLAD), Race, Disability, Religion, and Marital Status Discrimination and Retaliation, (RCW 49.60.180; RCW 49.60.210)**

283. Plaintiff realleges and incorporates by reference each of the preceding paragraphs as though fully set forth herein.

284. Defendant is an employer within the meaning of the Washington Law Against Discrimination.

## A. Protected Status

285. Plaintiff is a member of protected classes under WLAD, including race (biracial), disability, religion (Jewish), and marital status (single). RCW 49.60.180.

## B. Discrimination in Terms and Conditions and Discharge

286. RCW 49.60.180 prohibits employers from discriminating in compensation or other terms and conditions of employment and from discharging an employee because of protected characteristics.

287. Plaintiff's statistical analysis also showed that single employees were selected for layoff at a higher rate than married employees within the same restructuring process, supporting an inference of marital status discrimination under RCW 49.60.

288. Plaintiff was qualified for her position and performed her job duties satisfactorily.

289. Defendant subjected Plaintiff to adverse employment actions, including but not limited to: (a) reassigning Plaintiff's core job duties under the pretext of a reduction in force; (b) assigning Plaintiff substantial below-band operational work without additional compensation; (c) failing to honor and interfering with Plaintiff's disability accommodations; (d) subjecting Plaintiff to hostile and demeaning conduct related to her disability and religion; (e) treating Plaintiff less favorably than similarly situated employees outside her protected classes during the restructuring process, including the retention or reassignment of comparator employees; (f) terminating Plaintiff's

employment under circumstances giving rise to an inference of discrimination; and (g) stripping Plaintiff of her job duties during the notice period.

290. These actions constitute discrimination in the terms and conditions of employment and discharge because of Plaintiff's protected statuses in violation of RCW 49.60.180.

291. Defendant's July 2025 restructuring also produced disparate outcomes affecting non-white and single employees, including Plaintiff, and was not based on consistently applied or documented neutral criteria.

### C. Retaliation

292. RCW 49.60.210 makes it an unfair practice for an employer to discharge or otherwise discriminate against an employee because she opposed discriminatory practices or participated in proceedings under WLAD.

293. Plaintiff engaged in protected activity, including but not limited to: (a) submitting formal complaints of discrimination; (b) requesting and enforcing disability accommodations; (c) reporting accommodation violations; (d) participating in internal and external investigations; and (e) participating in mediation processes.

294. Defendant had actual knowledge of Plaintiff's protected activity.

295. Following this protected activity, Defendant subjected Plaintiff to materially adverse actions, including escalation of workload, increased scrutiny and hostility, termination during an ongoing mediation process, stripping Plaintiff of duties, and adverse actions during the severance process.

**D. Causation**

296. Under WLAD, liability is established where a protected characteristic or protected activity is a substantial factor in an adverse employment decision.

297. The temporal proximity between Plaintiff's protected activity and Defendant's adverse actions, together with the pattern of escalating conduct, supports a causal connection and permits an inference that Plaintiff's protected status and protected activity were substantial factors in Defendant's decisions.

**E. Damages**

298. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered and continues to suffer lost wages, lost benefits, loss of earning capacity, emotional distress, and other damages.

299. Pursuant to RCW 49.60.030, Plaintiff is entitled to recover all available remedies, including compensatory damages, equitable relief, and reasonable attorney's fees and costs.

**F. Nature of the Right**

300. The right to be free from discrimination in employment on the basis of race, disability, religion, and other protected characteristics is a civil right protected under Washington law.

301. Defendant's conduct constitutes unlawful discrimination and retaliation in violation of WLAD.

**COUNT IX — DECLARATORY RELIEF (INVALIDITY OF RELEASE)**

302. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

303. Plaintiff seeks a declaratory judgment that the September 10, 2025 Separation Agreement, including its waiver and release provisions, is void, voidable, or unenforceable as applied to Plaintiff's statutory discrimination, retaliation, and disability claims because Plaintiff did not execute it knowingly, voluntarily, and intelligently, and because the release was procured by misrepresentation, omission, coercion, and procedural unfairness

**A. Actual Controversy and Jurisdiction**

304. An actual and justiciable controversy exists between the parties concerning whether Defendant will contend that the Separation Agreement bars Plaintiff's statutory claims and whether Plaintiff may continue to pursue those claims in this action.

305. Declaratory relief is appropriate under 28 U.S.C. § 2201 and Fed. R. Civ. P. 57 because a declaration concerning the enforceability and scope of the release will resolve, or materially narrow, the parties' dispute and determine whether Plaintiff's statutory claims may proceed.

**B. Lack of Knowing, Voluntary, and Intelligent Waiver**

306. A waiver of federal employment-rights claims is enforceable only if it is knowing and voluntary under the totality of the circumstances.

55

307. Plaintiff did not knowingly, voluntarily, or intelligently waive her statutory claims.

308. Defendant characterized the agreement as "standard" and "boilerplate" without explaining provisions imposing significant legal consequences.

309. Defendant failed to explain the practical effect of the release on Plaintiff's ability to pursue discrimination, retaliation, and disability claims in court.

310. Defendant failed to disclose material information necessary for Plaintiff to evaluate the value of the claims being released.

311. Defendant created conditions that limited Plaintiff's ability to obtain clarification regarding material provisions.

312. Defendant did not clearly disclose that the agreement purported to waive judicial adjudication of statutory claims or the right to a jury trial.

313. These circumstances deprived Plaintiff of a meaningful opportunity to understand the scope and consequences of the waiver.

### C. Fraud, Misrepresentation, and Material Omissions

314. Plaintiff's assent to the release was procured through material misrepresentations and omissions directed at the release provisions themselves, including but not limited to : (a) Failure to disclose material facts concerning comparator employee retention and reassignment decisions; (b) Failure to disclose the status, scope, or potential findings of internal investigations relating to Plaintiff's protected complaints; (c) Characterizing the agreement as routine or standard while omitting explanation of provisions imposing significant legal and financial consequences; (d) Failing to disclose the practical effect of provisions affecting Plaintiff's statutory rights; and

56

Failing to provide information necessary for Plaintiff to reasonably evaluate the claims being released.

315. Defendant further represented that Plaintiff had forty-five days to consider the agreement while simultaneously attempting to accelerate Plaintiff's separation date and conditioning severance on execution of the agreement within a materially shorter and uncertain timeframe.

316. These misrepresentations and omissions were material, were directed to securing Plaintiff's signature, and induced Plaintiff to execute the release without informed consent. Fraud must be pleaded with particularity under Fed. R. Civ. P. 9(b).

**D. Economic Duress and Coercive Circumstances**

317. Plaintiff's execution of the agreement was further influenced by economic pressure and coercive circumstances, including: (a) The loss of employment income; (b) Conditioning severance benefits on execution of the agreement; (c) Defendant's attempt to advance Plaintiff's separation date, which would have accelerated loss of employer-provided health insurance; (e) Plaintiff's worsening medical condition and dependence on continued income and health coverage; and (f) the practical financial barriers associated with continuity of medical care after separation.

**E. Procedural Unfairness and Information Asymmetry**

318. The negotiation process was procedurally unfair and deprived Plaintiff of a meaningful opportunity to provide informed consent.

319. Defendant designated a single point of contact for negotiations who did not provide substantive responses to material questions during critical portions of the review period and did not identify an alternate contact for clarification.

320. Defendant also introduced new substantive provisions during negotiations after Plaintiff raised protected concerns, further complicating Plaintiff's ability to evaluate the agreement.

321. Plaintiff's negotiations were primarily focused on reducing perceived financial exposure arising from confidentiality, non-disparagement, and damages provisions. Plaintiff did not reasonably understand the release provisions to waive her ability to pursue statutory claims.

322. These circumstances reflect substantial information asymmetry and procedural unfairness affecting Plaintiff's ability to understand the release.

### F. Federal and State Statutory Context

323. To the extent the Separation Agreement purports to waive age-discrimination claims under the ADEA, any waiver must be knowing and voluntary and must satisfy the minimum statutory requirements of 29 U.S.C. § 626(f). Plaintiff alleges the release did not satisfy those requirements.

324. To the extent the release implicates Washington-law employment discrimination claims, including claims under RCW 49.60.180, the Court should interpret and enforce any purported waiver narrowly and consistent with Washington's public policy against employment discrimination.

## G. Washington Public Policy

325. To the extent the release or related provisions restrict discussion or disclosure of unlawful workplace conduct, such provisions are void and unenforceable under RCW 49.44.211 and relevant Washington public policy.

## H. Post-Execution Conduct Supporting Rescission

326. Defendant's failure to timely pay wages due under the agreement further supports Plaintiff's claim that the agreement is voidable and subject to rescission.

327. As alleged above, Section 2.1 of the Separation Agreement required Defendant to pay Plaintiff's final wages on the Foundation's next regular payroll date. Plaintiff remained on payroll through September 14, 2025, and her final wages for September 11 through September 14, 2025, were due on the September 15, 2025, payroll date, but were not paid until September 30, 2025.

328. Defendant's failure to timely perform its payment obligations is post-execution conduct evidencing lack of good faith and further supporting rescission or voidability.

## I. Totality of the Circumstances

329. Considering all relevant circumstances, including Defendant's conduct, the timing and conditions of execution, the parties' information asymmetry, Plaintiff's medical and financial circumstances, and the absence of meaningful opportunity for informed deliberation, Plaintiff did not execute the release knowingly, voluntarily, or intelligently.

59

330. At minimum, these allegations present disputed factual issues that cannot be resolved on the pleadings alone.

**J. Relief Requested**

331. WHEREFORE, Plaintiff respectfully requests that the Court: (a) Declare that the Separation Agreement's release provisions are void, voidable, or unenforceable as to Plaintiff's statutory claims; (b) Declare that Plaintiff did not knowingly or voluntarily waive her statutory rights; (c) Declare that the release does not bar Plaintiff's claims; (d) Declare that Plaintiff retains the right to pursue her statutory claims in this Court; and (e) Grant such further relief as the Court deems just and proper.

**COUNT X — DECLARATORY RELIEF (INVALIDITY OF ARBITRATION AGREEMENT AND DELEGATION CLAUSE)**

332. Plaintiff realleges and incorporates all preceding paragraphs as though fully set forth herein.

333. An actual controversy exists between the parties regarding whether Plaintiff may be compelled to arbitrate her statutory discrimination, retaliation, and disability-related claims and whether any purported delegation clause requires an arbitrator, rather than the Court, to decide threshold questions of arbitrability.

334. Plaintiff seeks declaratory relief under 28 U.S.C. § 2201 and Fed. R. Civ. P. 57 that no valid, enforceable, or mutually assented agreement to arbitrate Plaintiff's statutory employment claims was formed, and that any purported delegation clause is invalid,

unenforceable, or otherwise ineffective to deprive the Court of authority to decide arbitrability.

### A. No Valid Agreement to Arbitrate Plaintiff's Statutory Employment Claims Was Formed

335. Plaintiff alleges that no valid and enforceable agreement to arbitrate her statutory employment claims was formed.

336. Plaintiff did not knowingly or voluntarily assent to waive a judicial forum, a jury trial, or ordinary judicial procedures for her statutory discrimination, retaliation, and disability claims.

337. Beginning on or about August 18, 2025, Defendant, through Deputy Director of Legal–Employment Adam Tullman, initiated separation discussions, represented that he was authorized to resolve the matter, and held himself out as Plaintiff's point of contact for the negotiations.

338. Defendant's communications and conduct reasonably led Plaintiff to understand that Tullman was Defendant's designated representative for separation negotiations.

339. During those negotiations, Defendant characterized the agreement as routine, "standard," and "boilerplate," including before a draft separation agreement was presented to Plaintiff.

340. Defendant did not clearly explain that the agreement purported to require arbitration of Plaintiff's statutory discrimination, retaliation, or disability claims.

341. Defendant did not clearly explain that Plaintiff would be waiving the right to bring such claims in court.

342. Defendant did not clearly explain the practical consequences of arbitration, including waiver of jury trial, limitations on discovery, differences in procedural protections, and limits on judicial review.

343. Defendant did not provide the governing arbitration rules to Plaintiff before execution of the agreement.

344. Defendant did not obtain a separate acknowledgment that Plaintiff understood she was waiving the right to pursue such claims in a judicial forum.

345. Plaintiff therefore did not knowingly or voluntarily assent to arbitrate her statutory employment claims.

346. The negotiations focused primarily on severance, separation timing, benefits continuation, references, confidentiality, and non-disparagement, rather than any meaningful explanation of arbitration or waiver of judicial rights.

347. Based on Defendant's characterization of the agreement and the context of the negotiations, Plaintiff reasonably understood the dispute resolution provision to apply primarily to post-separation contractual matters such as confidentiality and non-disparagement obligations rather than to statutory discrimination or retaliation claims.

348. Defendant may rely on the following dispute-resolution language contained in Section 17 of the September 10, 2025, Separation Agreement (attached as Exhibit B): "DISPUTE RESOLUTION. Except for any claim by either party to seek injunctive relief arising out of a breach of a party's obligations to protect the other's proprietary information, the parties will submit to binding arbitration any and all disputes, claims, or controversies arising out of or related to Employee's hiring, employment, or termination, and/or the validity, enforceability, interpretation, performance, or breach

62

of this Agreement, whether sounding in tort, contract, statutory violation, or otherwise, or involving the construction or application of any of the terms, provisions, or conditions of this Agreement. Arbitration before a sole neutral arbitrator will occur in Seattle, Washington. The arbitration will be administered by JAMS pursuant to its Employment Arbitration Rules & Procedures then in effect. This Agreement is intended to provide for arbitration on an individual basis as the sole and exclusive means for resolution of all disputes between the parties to the fullest extent permitted by law. The parties expressly waive any entitlement to have such controversies decided by a court or jury. Employee will not be liable for arbitration fees beyond those costs Employee would have incurred had a claim been filed in a court of competent jurisdiction. This dispute resolution provision may be enforced under the Federal Arbitration Act. This Agreement will otherwise be governed by the laws of the State of Washington. This Agreement to arbitrate does not interfere with Protected Activity or apply to unemployment claims, workers' compensation claims, sexual harassment or sexual assault claims, or other matters that cannot be arbitrated."

349. Even if that language is enforceable as written against some claims, Plaintiff alleges that she did not knowingly agree that it applied to her statutory discrimination, retaliation, or disability claims.

350. Under the Federal Arbitration Act, arbitration is enforceable only where a valid agreement to arbitrate was formed and assented to. 9 U.S.C. § 2. 9 U.S.C. § 2

351. Where the making of the arbitration agreement is in issue, the Court must determine that issue before compelling arbitration. 9 U.S.C. § 4. 9 U.S.C. § 4

63

352. Courts may order arbitration only when they are satisfied that the parties agreed to arbitrate the dispute at issue, and where formation of the arbitration agreement is contested, the Court must resolve that dispute. *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287 (2010)

353. Plaintiff specifically challenges the formation of the arbitration provision itself, not merely the contract as a whole.

## B. No Valid Agreement to Delegate Arbitrability Was Formed

354. Plaintiff further alleges that no clear and unmistakable agreement was formed to delegate gateway questions of arbitrability to an arbitrator.

355. Plaintiff did not separately assent to any delegation provision.

356. Defendant did not clearly explain that any language in the agreement would transfer threshold questions of arbitrability, enforceability, or formation from a court to an arbitrator.

357. Defendant may contend that delegation arises from language contained within Section 4.2 of the Separation Agreement (attached as Exhibit B) rather than from a separately titled delegation clause. The relevant language states: "To the fullest extent permitted by law, any dispute regarding the scope of this general release will be determined by an arbitrator under the procedures set forth in the arbitration clause below."

358. That language was not presented to Plaintiff as a delegation clause.

359. It was not separately labeled as a delegation provision.

360. It was not explained as transferring threshold questions of arbitrability, formation, or enforceability from the Court to an arbitrator.

64

361. Plaintiff did not knowingly agree to delegate arbitrability.

362. Although parties may clearly and unmistakably delegate certain gateway questions to an arbitrator, the Court must first determine whether the parties formed an agreement to delegate those issues at all. *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63 (2010); *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938 (1995)

363. A delegation clause is treated as an additional agreement to arbitrate threshold issues, but formation of that additional agreement remains for the Court when challenged. *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63 (2010)

364. Plaintiff alleges that no such valid delegation agreement exists here.

## C. Fraudulent Inducement Directed to the Arbitration and Delegation Provisions

365. In the alternative, Plaintiff alleges fraud and fraudulent omission directed specifically to the arbitration and delegation provisions.

366. Defendant made material misrepresentations and omissions to induce Plaintiff's assent, including: (a) characterizing the agreement as routine or "boilerplate"; (b) failing to disclose that arbitration would govern statutory discrimination, retaliation, and disability claims; (c) failing to disclose the existence and effect of any delegation provision; and (d) withholding material information necessary for Plaintiff to evaluate the rights she was being asked to waive.

367. Defendant did not disclose that the agreement purported to require arbitration of statutory employment claims.

368. Defendant did not disclose the existence or effect of any delegation provision.

369. Defendant did not clearly disclose the waiver of Plaintiff's right to a judicial forum or jury trial for statutory claims.

370. These misrepresentations and omissions occurred during negotiations conducted by Defendant's designated representative between August and September 2025.

371. Plaintiff reasonably relied on Defendant's representations and omissions.

372. These misrepresentations and omissions were directed at securing Plaintiff's assent to arbitration without informed understanding.

373. Where fraud is directed to the arbitration clause itself, the Court must determine enforceability. *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395 (1967); *Rent-A-Center, W., Inc.* v. Jackson, 561 U.S. 63 (2010)

374. Plaintiff pleads fraud with particularity under Fed. R. Civ. P. 9(b).

**D. The Arbitration and Delegation Provisions Are Procedurally Unconscionable**

375. In the alternative, Plaintiff alleges that the arbitration and delegation provisions are procedurally unconscionable under applicable Washington law.

376. The provisions were presented in the context of unequal bargaining power and time pressure.

377. Defendant attempted to accelerate the separation date.

378. Plaintiff was dealing with a medical condition and dependence on continued income and health coverage.

379. Plaintiff was not given a meaningful opportunity to obtain clarification.

380. Defendant designated a single contact who did not respond meaningfully to material questions.

381. There was substantial informational asymmetry regarding Plaintiff's employment circumstances, claims, and legal rights.

382. Defendant did not provide meaningful explanation of arbitration despite Plaintiff not being represented by counsel.

383. Defendant did not obtain separate acknowledgment of arbitration or delegation.

384. These circumstances support procedural unconscionability.

385. To the extent the delegation language purports to operate only in Defendant's favor, Plaintiff further alleges substantive unconscionability because it imposes arbitration burdens and risks without mutuality or adequate justification.

386. These defects independently render the arbitration and delegation provisions unenforceable under generally applicable contract defenses preserved by the FAA. 9 U.S.C. § 2. 9 U.S.C. § 2

387. Any purported delegation language appears within provisions addressing the scope of the release rather than within the arbitration provision itself. Such language, even if enforceable, would at most apply to disputes concerning interpretation of the release, not whether a valid agreement to arbitrate statutory claims was formed.

388. Questions concerning whether Plaintiff agreed to arbitrate statutory discrimination and retaliation claims are distinct from disputes concerning the scope of a contractual release and remain issues for judicial determination.

**E. Judicial Determination Is Required Before Any Arbitration Can Be Compelled**

389.   Because Plaintiff challenges the formation and validity of the arbitration agreement and the delegation clause themselves, the Court must resolve those issues before compelling arbitration.

390.   Plaintiff alleges that the making of the arbitration agreement and any delegation agreement is in issue.

391.   Accordingly, the Court, not an arbitrator, must determine whether a valid agreement to arbitrate Plaintiff's statutory claims exists and whether any valid delegation agreement was formed. 9 U.S.C. § 4. 9 U.S.C. § 4

392.   At minimum, the disputes concerning Plaintiff's knowledge, Defendant's representations, the placement and explanation of the arbitration language, and the circumstances surrounding execution present factual issues concerning contract formation that must be resolved by the Court before arbitration may be compelled.

**F. REQUEST FOR RELIEF**

393.   WHEREFORE, Plaintiff respectfully requests that the Court: (a) Declare that no valid and enforceable agreement to arbitrate exists between the parties as to Plaintiff's statutory discrimination, retaliation, and disability claims; (b) Declare that the arbitration provision and any delegation clause in the September 10, 2025 Separation Agreement are void, voidable, or unenforceable; (c) Determine that the Court, not an arbitrator, shall decide issues of arbitrability; (d) Deny any motion to compel arbitration or stay proceedings based on the arbitration provision; and (e) Grant such other and further relief as the Court deems just and proper.

68

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendant, and grant the following relief:

A. Back pay in an amount to be proven at trial, including all lost wages, salary increases, bonuses, benefits, retirement contributions, and other compensation, together with pre-judgment interest;

B. Front pay and/or future lost earnings in lieu of reinstatement in an amount to be determined at trial;

C. Compensatory damages for emotional distress, pain and suffering, reputational harm, and other non-economic losses;

D. Punitive damages as permitted by law, including under 42 U.S.C. § 1981 and applicable federal statutes;

E. Equitable relief including reinstatement to Plaintiff's former position or a comparable position, or alternatively front pay where reinstatement is not feasible;

F. A declaratory judgment under 28 U.S.C. § 2201 and Fed. R. Civ. P. 57 that:

(1) the Separation Agreement and Release is void, voidable, or unenforceable because it was not knowing, voluntary, or informed under the totality of the circumstances;

(2) the arbitration provision, including any delegation clause, is void or unenforceable under 9 U.S.C. § 2 and applicable contract law because it was procured through fraud, lack of mutual assent, unconscionability, and duress;

(3) no valid agreement to arbitrate exists, or alternatively that the arbitration and delegation provisions are independently unenforceable;

(4) the Court, not an arbitrator, shall decide issues of arbitrability and enforceability; and

(5) Plaintiff did not knowingly or voluntarily waive the right to a judicial forum for statutory discrimination and retaliation claims;

G. An order denying any motion to compel arbitration and retaining jurisdiction over all claims asserted herein;

H. All statutory damages available under federal and Washington law, including RCW 49.60.030;

I. Reasonable attorneys' fees, expert witness fees, litigation expenses, and costs pursuant to applicable statutes;

J. Pre-judgment and post-judgment interest as permitted by law;

K. A supplemental award to offset adverse tax consequences associated with any lump-sum recovery; and

L. Such other and further legal or equitable relief as the Court deems just and proper.

## VII.    JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable pursuant to Fed. R. Civ. P. 38.

DATED:

Respectfully submitted,



Shihwa Hwang-Meza

Plaintiff, Pro Se

3000F Danville Blvd. #267

Alamo, CA 94507

Phone: 408-410-8997

Email: shihwa@yahoo.com

**EXHIBIT A: EEOC Notice of Right to Sue**
**Charge No. 551-2025-07070, issued January 13, 2026**

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

Seattle Field Office
909 First Avenue, Suite 400
Seattle, WA 98104
(206) 576-3000
Website: www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS
(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 01/13/2026

**To:** Shihwa Hwang-Meza
2601 76th Ave SE Unit 359
Mercer Island, WA 98040
Charge No: 551-2025-07070

EEOC Representative and email:   Bryne Moore
Investigator
bryne.moore@eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice that the EEOC has dismissed your charge and has issued you notice of your right to sue the respondent(s) on this charge. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of EEOC's official notice of dismissal.** You should keep a record of the date you received the EEOC's official notice of dismissal. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 551-2025-07070.

On Behalf of the Commission:

January 13, 2026
Date

Elizabeth Cannon
Director                                              For

**Cc:**
**Gates Foundation**
Mark.Suzman@gatesfoundation.org

Please retain this Notice for your records.

Enclosure with EEOC Notice of Closure and Rights (05/25)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court **under Federal law**. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

### IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you** *receive* **EEOC's official notice of dismissal. You should keep a record of the date you received EEOC's official notice of dismissal**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving EEOC's official notice of dismissal (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA, the ADEA, or the PWFA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of your receipt of EEOC's official notice of dismissal and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

### ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

### HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or 2) a "Section 83" request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of EEOC's official notice of dismissal, please submit your FOIA and/or Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.

**To make a FOIA request for your charge file**, submit your request online at https://eeoc.arkcase.com/foia/portal/login (this is the preferred method).  You may also submit a

Enclosure with EEOC Notice of Closure and Rights (05/25)

FOIA request for your charge file by U.S. Mail by submitting a signed, written request identifying your request as a "FOIA Request" for Charge Number 551-2025-07070 to the District Director at Christopher Green, 450 Golden Gate Avenue 5 West PO Box 36025, San Francisco, CA 94102.

**To make a Section 83 request for your charge file**, submit a signed written request stating it is a "Section 83 Request" for Charge Number 551-2025-07070 to the District Director at Christopher Green, 450 Golden Gate Avenue 5 West PO Box 36025, San Francisco, CA 94102.

You may request the charge file up to 90 days after receiving EEOC's official notice of dismissal. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA requests, go to https://www.eeoc.gov/eeoc/foia/index.cfm.

For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section-83-disclosure-information-charge-files.

**NOTICE OF RIGHTS UNDER THE ADA AMENDMENTS ACT OF 2008 (ADAAA)**

The ADA was amended, effective January 1, 2009, to broaden the definitions of disability to make it easier for individuals to be covered under the ADA/ADAAA. A disability is still defined as (1) a physical or mental impairment that substantially limits one or more major life activities (actual disability); (2) a record of a substantially limiting impairment; or (3) being regarded as having a disability. *However, these terms are redefined, and it is easier to be covered under the new law.*

If you plan to retain an attorney to assist you with your ADA claim, we recommend that you share this information with your attorney and suggest that he or she consult the amended regulations and appendix, and other ADA related publications, available at: http://www.eeoc.gov/laws/types/disability_regulations.cfm.

**"Actual" disability or a "record of" a disability**

If you are pursuing a failure to accommodate claim you must meet the standards for either "actual" or "record of" a disability:

- ✓ **The limitations from the impairment no longer must be severe or significant** for the impairment to be considered substantially limiting.

- ✓ In addition to activities such as performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, thinking, concentrating, reading, bending, and communicating (more examples at 29 C.F.R. § 1630.2(i)), **"major life activities" now include the operation of major bodily functions**, such as: functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions; or the operation of an individual organ within a body system.

- ✓ **Only one** major life activity need be substantially limited.

Enclosure with EEOC Notice of Closure and Rights (05/25)

- ✓ Except for ordinary eyeglasses or contact lenses, the beneficial effects of **"mitigating measures"** (e.g., hearing aid, prosthesis, medication, therapy, behavioral modifications) **are not considered** in determining if the impairment substantially limits a major life activity.

- ✓ An impairment that is **"episodic"** (e.g., epilepsy, depression, multiple sclerosis) or **"in remission"** (e.g., cancer) is a disability if it **would be substantially limiting when active**.

- ✓ An impairment **may be substantially limiting even though** it lasts or is expected to last **fewer than six months**.

**"Regarded as" coverage**

An individual can meet the definition of disability if an **employment action was taken because of an actual or perceived impairment** (e.g., refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment).

- ✓ "Regarded as" coverage under the ADAAA no longer requires that an impairment be substantially limiting, or that the employer perceives the impairment to be substantially limiting.

- ✓ The employer has a defense against a "regarded as" claim only when the impairment at issue is objectively **both** transitory (lasting or expected to last six months or less) **and** minor.

- ✓ A person is not able to bring a failure to accommodate claim **if** the individual is covered only under the "regarded as" definition of "disability."

*Note: Although the amended ADA states that the definition of disability "shall be construed broadly" and "should not demand extensive analysis," some courts require specificity in the complaint explaining how an impairment substantially limits a major life activity or what facts indicate the challenged employment action was because of the impairment. Beyond the initial pleading stage, some courts will require specific evidence to establish disability.* For more information, consult the amended regulations and appendix, as well as explanatory publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.

**Exhibit B: Separation Agreement**

**Signed September 10, 2025**

Docusign Envelope ID: AB2D229F-0EF6-4F84-B04E-8FC8CC1B0AED

# Gates Foundation

PO Box 23350 Seattle, WA 98102, USA
T: +1.206.709.3100
F: +1.206.494.7100
www.gatesfoundation.org

## SEPARATION AGREEMENT

This Separation Agreement ("**Agreement**") is entered into by Shihwa Hwang-Meza ("**Employee**") and the Gates Foundation ("**Foundation**").

1.  **SEPARATION DATE.** Employee will remain employed through the Foundation through September 14, 2025 ("**Separation Date**"). Employee represents that, up through the Separation Date, Employee has, to the best of Employee's knowledge, fully complied with all Employee's obligations to the Foundation and given best efforts to cooperating with and assisting the Foundation in relation to Employee's separation of employment and the transition of job duties and work responsibilities. Employee acknowledges and will claim no further right to employment by the Foundation after the Separation Date.

2.  **EARNED PAYMENTS AND BENEFITS.**

    2.1   The Foundation has provided Employee all compensation and benefits that Employee has earned, including any bonus payments; if any wages are owed for Employee's final pay period or unused accrued vacation (if any), those wages will be paid on the Foundation's next pay day or earlier if required by law. Except as stated in this Agreement, or legally required, all compensation and benefits will end on the Separation Date. Employee assets in any Foundation retirement plan will be handled under the terms and conditions of the applicable plan.

    2.2   Insurance benefits (including health and the employee assistance program) will end on the last day of the month of the Separation Date. Disability insurance coverage ends on the Separation Date. Employee may exercise any rights Employee may have under COBRA to continue health benefits under the Foundation group health plan. If Employee is eligible and timely elects coverage, the standard offering of COBRA continuation coverage will be for up to 18 months (unless a longer period is required by law) at Employee's expense, and this right exists regardless of whether Employee signs this Agreement. Employee will be fully responsible for the premiums for such continued coverage.

3.  **ADDITIONAL PAYMENTS.** In consideration of Employee's promises, waiver, and release under this Agreement, the Foundation will provide Employee the following pay and benefits (collectively, "**Separation Benefits**"):

- A lump sum payment of $147,942.18 minus applicable withholdings, which will be paid within fourteen (14) days of the Effective Date (as defined in Section 12): this payment consists of:

44775\20564005.1

Docusign Envelope ID: AB2D229F-0EF6-4F84-B04E-8FC8CC1B0AED

o   A lump sum payment in the gross amount of $129,204.27 equivalent to 39 weeks of severance),

o   A lump sum payment in the gross amount of $17,577.69 equivalent to 13 months of COBRA premiums.

o   A lump sum payment of $1,160.22. This payment represents the difference between the $5,300 amount of prorated contribution which will be deposited in Employee's retirement account during the regular payout under the foundation retirement plan, and the full payment if Employee had remained employed.

Employee acknowledges and agrees that (a) the Foundation is not obligated to provide Employee with the Separation Benefits, except under this Agreement; (b) the Foundation's provision of the Separation Benefits to Employee constitutes consideration for Employee's promises, waiver, and release in this Agreement; and (c) the Foundation's obligations under this Agreement are conditioned upon Employee entering into this Agreement. Employee also acknowledges and agrees that Employee's entitlement to earn and retain the Separation Benefits is conditioned on (a) Employee's full compliance with this Agreement, the Confidentiality Agreement (as defined in Section 8), and any other obligations of Employee to the Foundation; and (b) Employee not being rehired by the Foundation or any wholly owned subsidiary before all Separation Benefits have been provided, as Separation Benefits are intended to assist with job loss and are considered an advance that is only earned when the last of the Separation Benefits are provided to Employee before any rehire. Pursuant to Foundation policies Employee will be marked eligible for rehire in internal systems.

4.   **WAIVER AND RELEASE.**

4.1   On behalf of Employee and Employee's heirs, executors, administrators, and assigns, Employee waives, releases, and discharges any and all claims against any or all of the Released Parties (as defined below), whether known or unknown, anticipated or unanticipated, contingent, or otherwise, occurring or that could be alleged to have occurred before the execution of this Agreement ("**Released Claims**"). This release is comprehensive and Released Claims include all claims (including claims to costs or attorneys' fees), damages, causes of action, and disputes of any kind whatsoever, including claims for wages, reimbursements, employee benefits, and damages arising under:

a.   any federal, state, or local law, regulation, or constitution dealing with employment, compensation, benefits, or discrimination such as those laws or regulations concerning discrimination, harassment, retaliation, or other unlawful conduct on the basis of race (including traits historically associated with race, such as hair texture and protective hairstyles), color, creed, religion, age, sex, sexual orientation (including gender expression/identity), pregnancy (including childbirth and related medical conditions), national origin, ancestry, citizenship, veteran status, military service or application for military service, marital or registered domestic partner status, disability or handicap, medical condition, genetic testing and

Docusign Envelope ID: AB2D229F-0EF6-4F84-B04E-8FC8CC1B0AED

information, HIV or AIDS status, possession of sickle cell or hemoglobin C trait, lawful use of lawful products, political affiliation, status as a domestic violence victim, testimony or assistance with hazardous chemicals proceedings or investigations, jury service, family, medical, or other protected leaves of absence, engaging in acts protected by public policy, National Guard service, background checks, criminal history, or any other characteristic protected by law, including claims under the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq., the Older Workers' Benefit Protection Act of 1990, Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act, and the civil rights and employment laws applicable to Employee's country, state, county, or city of employment;

b.    any federal, state, or local law, regulation, or constitution relating to termination rights or benefits (including the Employee Retirement Income Security Act of 1974 ("**ERISA**"), the Worker Adjustment and Retraining Notification Act, and any state equivalent); and

c.    any other basis for legal or equitable relief whether based on express or implied contract, Foundation plan, policy, or practice (including any severance plan or guidelines), tort, statute, constitution, common law, or other legal or equitable ground, including claims of tortious interference with contract or prospective business advantage, breach of the covenant of good faith and fair dealing, promissory estoppel, detrimental reliance, invasion of privacy, nonphysical injury, personal injury or sickness or any other harm, wage and hour, wrongful or retaliatory discharge, fraud, defamation, libel, slander, false imprisonment, and negligent or intentional inflection of emotional distress.

Employee not only releases and discharges the Released Parties from all claims Employee could make on Employee's own behalf or on behalf of others, but also those claims that any other person or organization could make on Employee's behalf, and Employee waives any right to recover any damage awards as a member of any class in a case alleging any claim against the Released Parties.

4.2    Employee and the Foundation do not intend to release (and this Agreement does not release) any of the following: (a) claims for breach or enforcement of this Agreement, (b) claims that arise after execution of this Agreement (including claims challenging the validity of this Agreement under the Age Discrimination in Employment Act and Older Workers Benefits Protection Act), (c) entitlement claims under ERISA for vested benefits arising under any applicable ERISA plan, (d) workers' compensation or unemployment claims, or (e) any other claims Employee may not release as a matter of law under this Agreement. To the fullest extent permitted by law, any dispute regarding the scope of this general release will be determined by an arbitrator under the procedures set forth in the arbitration clause below.

Docusign Envelope ID: AB2D229F-0EF6-4F84-B04E-8FC8CC1B0AED

4.3     For the purpose of this Agreement, "**Released Parties**" means the Foundation, the Gates Foundation Trust, and all of their affiliates and related companies (including Gates Medical Research Institute and Gates Agricultural Innovations), subsidiaries, and divisions, as well as all of their present, former, and future successors and assigns, and all of their present, former, and future owners, trustees, directors, officers, managers, employees, agents, assigns, insurers, employee benefit plans or programs (and the trustees, administrators, fiduciaries, and insurers of such plans or programs and their affiliates), attorneys, partners, and volunteers, in their individual and representative capacities.

5.     **ADDITIONAL WAIVER.** Employee understands and agrees that as a condition of this Agreement, Employee hereby expressly waives and relinquishes any and all claims, rights, or benefits that Employee may have under any applicable law that would otherwise limit Employee's ability to release unknown claims, including California Civil Code Section 1542, which provides:

> A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release, and that if known by him or her would have materially affected his or her settlement with the debtor or released party.

In connection with such waiver and relinquishment, Employee hereby acknowledges that Employee may subsequently discover claims or facts in addition to, or different from, those that Employee now knows or believes to exist, but that Employee expressly agrees to fully, finally, and forever settle and release any and all claims, known or unknown, suspected or unsuspected, that exist or may exist on Employee's behalf against the Released Parties at the time of execution of this Agreement, including any and all claims relating to or arising from Employee's employment with the Foundation and the termination of that employment.

6.     **CHARGES; SETOFFS; MISCELLANEOUS.** Employee warrants that neither Employee nor anyone on Employee's behalf has filed any complaints, lawsuits, or other actions based on any Released Claim, except as listed below Employee's signature. If no complaints, lawsuits, or other actions are so listed, none have been filed. Nothing in this Agreement prevents Employee from filing or prosecuting a charge with any Government Agency or participating in an investigation or proceeding conducted by the any Government Agency in relation to such charge or complaint. For purposes of this Agreement, "**Government Agency**" means any employment-related agency or commission, securities regulatory agency or authority, or other federal, state, and local governmental agency or commission (such as the Equal Employment Opportunity Commission, the National Labor Relations Board, the Occupational Safety and Health Administration, and the Securities and Exchange Commission). Unless prohibited by law, Employee further understands and agrees that Employee (a) will not seek and is hereby waiving any claim for personal damages and/or other personal relief; (b) will cause the withdrawal or dismissal with prejudice of any claim Employee has purported to waive in this Agreement. Notwithstanding the foregoing, this Agreement does not limit Employee's ability to receive an award for information provided to the Securities and Exchange

Docusign Envelope ID: AB2D229F-0EF6-4F84-B04E-8FC8CC1B0AED

Commission or, if expressly authorized by law, another Government Agency. Employee represents and warrants that Employee is the sole owner of any and all Released Claims that Employee may have and that Employee has not assigned, transferred, or otherwise disposed of Employee's right or interest in any Released Claim. Nothing in this Agreement prohibits or impairs Employee or the Foundation from complying with all applicable laws, nor will this Agreement be construed to obligate either party to commit (or aid or abet in the commission of) any unlawful act.

7. **FOUNDATION PROPERTY.** Employee represents and warrants that Employee has returned to the Foundation all Foundation property, including all files, memoranda, keys, credit cards, manuals, equipment, data, records and other documents (including electronically recorded documents and data), passwords (including any PINs), and physical property that Employee received from the Released Parties or generated in the course of employment with or service to the Foundation. Documents relating to Employee's personal compensation, benefits, or this agreement, as well as personally created materials not related to the Foundation or Foundation confidential information are not considered Foundation property subject to this section. If Employee discovers that Employee possesses such property after the date of this Agreement, Employee will immediately return to the Foundation such property and all copies of such property as recorded in any medium.

8. **CONFIDENTIALITY AGREEMENT.** As a condition of employment, Employee signed the Gates Foundation Confidentiality and Intellectual Property Assignment Agreement ("**Confidentiality Agreement**"). Employee acknowledges and agrees that the Confidentiality Agreement remains binding on Employee and in full force and effect, provided that the Foundation will not enforce any provisions prohibited by law. Employee represents and warrants that Employee has fully complied with the Confidentiality Agreement at all times before signing this Agreement. Nothing in this Agreement, including Sections 8, 9, 10, or 11 is intended to restrict Employee's compliance with law or legal process.

9. **CONFIDENTIALITY AND NON-DISPARAGEMENT.**

9.1    Employee agrees to maintain in complete confidence the consideration for this Agreement ("**Separation Information**"). Employee may disclose Separation Information only to Employee's parent or an arbitrator in any proceedings to enforce the terms of this Agreement, Employee's legal counsel, and Employee's accountant and any professional tax advisor to the extent that they need to know the Separation Information to provide advice on tax treatment or to prepare tax returns, each of whom Employee will inform of the confidentiality obligations in this Agreement. Employee must use commercially reasonable efforts to prevent disclosure of any Separation Information to all other third parties. Employee agrees that Employee will not publicize, directly or indirectly, any Separation Information, and understands and agrees that the Foundation may disclose the terms and circumstances of this Agreement to any of the Released Parties. The foregoing is not intended to dissuade or preclude Employee from exercising protected rights, including the NLRA Protected Activities (as defined in Section 10.1), and does not apply if prohibited by law.

Docusign Envelope ID: AB2D229F-0EF6-4F84-B04E-8FC8CC1B0AED

9.2    Employee warrants that Employee has not disclosed, orally or in writing, directly or indirectly, any confidential information of the Foundation to any unauthorized party. The obligations under this Section 9 are supplemental to, and not in lieu of, Employee's obligations under the Confidentiality Agreement and as otherwise imposed by law. The foregoing is not intended to dissuade or preclude Employee from exercising protected rights, including the Protected Activity (as defined in Section 10.1).

9.3    For the twelve (12) month period following the Separation Date, Employee will not disparage the Foundation or its officers, directors, employees, agents, or business (including strategy, programs, grants, and investments). For purposes of this Agreement, "disparage" means any communication (written or oral, including through social media) that is reckless or maliciously untrue. Employee also will refrain from any defamation, libel, or slander of any of the Released Parties and will refrain from tortious interference with the contracts and relationships of any of the Released Parties. The foregoing is not intended to dissuade or preclude Employee from exercising protected rights, including the Protected Activity (as defined in Section 10.1).

## 10.    PROTECTED ACTIVITY; NOTICE OF IMMUNITY.

10.1    Nothing in this Agreement (including Sections 4, 5, 6, 8, or 9) is intended to or does restrict or impede Employee from exercising rights to do any of the following (collectively, "**Protected Activity**"): (a) making disclosures as may be required or protected by law or legal process (including in connection with an investigation or proceeding by any Government Agency), (b) complying with any applicable law, regulation, or valid order of a court of competent jurisdiction or an authorized Government Agency or, (c) disclosing or discussing information about unlawful or illegal acts in the workplace, including harassment, discrimination, retaliation, wage and hour violations, sexual assault, conduct that is recognized as against a clear mandate of public policy, or any other conduct that Employee reasonably believes is unlawful or illegal, or information relevant to investigation or settlement of such a claim, or (d) otherwise exercising any protected rights that Employee cannot waive or forego by private agreement under applicable law or regulation, including rights referenced in this Section and in Section 6. For example, this Agreement is not intended to (and does not) preclude or dissuade Employee from engaging in concerted activities protected by the National Labor Relations Act such as discussing wages, benefits, or other terms and conditions of employment with others, including a Government Agency, former coworkers, and labor organizations.

10.2    Additionally, nothing in this Agreement is intended to or will be interpreted to conflict with the Defend Trade Secrets Act or create liability for disclosures allowed under that Act. Employee is hereby notified of the following provisions of 18 U.S.C. § 1833(b):

Docusign Envelope ID: AB2D229F-0EF6-4F84-B04E-8FC8CC1B0AED

(1) IMMUNITY.—An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that—(A) is made— (i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

(2) USE OF TRADE SECRET INFORMATION IN ANTI-RETALIATION LAWSUIT.—An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual—(A) files any document containing the trade secret under seal; and (B) does not disclose the trade secret except pursuant to court order.

11. **CONFIDENTIALITY OR NON-DISPARAGEMENT BREACH & LIQUIDATED DAMAGES.** The parties understand and agree that any violation of Section 9 would constitute a material breach of this Agreement, cause irreparable harm and entitle the harmed party to all remedies provided by law and equity, including immediate injunctive relief. The parties further agree that damages for a breach of Section 9 would be difficult to ascertain and that the aggrieved party is entitled to liquidated damages of $1,000 for each separate act or statement that breaches or violates these obligations, up to a maximum of $7,500, with such amount designed to defray the costs of investigating and documenting the breach, mitigating the impact of the breach and taking steps to prevent future breaches. The parties further agree that any breach of Section 9.3, will entitle the aggrieved party to recover any applicable damages, and where authorized by applicable law or JAMS rules, costs and attorneys' fees as provided in Section 17. In such case, and in the event of any payment under this Section or by virtue of breach of this Agreement, Employee's obligations, release, and waiver under this Agreement will remain in full force and effect and supported by consideration. The foregoing provision supplements and does not limit any legal remedies available to the parties.

12. **CONSIDERATION PERIOD.** In accordance with Foundation practices, employee has 45 days to consider this Agreement, after which time the offer of this Agreement will expire and may no longer be accepted. Employee may accept this Agreement before expiration of the 45-day consideration period, in which case Employee will waive the remainder of the consideration period. Employee agrees that subsequent changes to the Separation Benefits, if any, will not restart the running of the 45-day period. Employee is hereby advised to consult with an attorney before signing this Agreement. To accept, Employee must execute and deliver the Agreement via DocuSign or, if Employee does not have access to DocuSign, via another method identified in Section 14 and sent to hr@gatesfoundation.org. This Agreement will become effective upon delivery of this executed Agreement by Employee to the Foundation ("**Effective Date**").

13. **REFERENCES.** Employee will direct all employment reference requests to Foundation Human Resources: hr@gatesfoundation.org. The response will be limited to Employee's dates of employment and job title as of the Separation Date.

Docusign Envelope ID: AB2D229F-0EF6-4F84-B04E-8FC8CC1B0AED

14. **ENTIRE AGREEMENT; AMENDMENT; CONSTRUCTION.** This Agreement and the Confidentiality Agreement constitute the entire understanding between the Foundation and Employee regarding the subject matter of this Agreement and supersede all other representations, statements, understandings, and agreements pertaining to such subject matter. The Released Parties are third party beneficiaries of this Agreement. This Agreement may not be altered, amended, modified, or otherwise changed in any respect except by another written agreement that specifically refers to this Agreement, executed by Employee and an authorized Foundation representative. This Agreement may be executed in any number of counterparts, each of which will constitute an original and all of which together will constitute one and the same instrument. Delivery of an executed counterpart of this Agreement by facsimile, email in portable document format (.pdf), by DocuSign, or by any other electronic means that preserves the original appearance of a document will have the same force and effect as execution of an original, and a copy of a signature will be equally admissible in any legal proceeding as if an original. The headings in this Agreement are for reference purposes only, are not part of this Agreement, and will not affect the construction of, or be taken into consideration in interpreting, this Agreement. The words "include," "including," and similar terms used in the Agreement will be construed as if followed by the words "without limitation." Nothing in this Agreement reflects any admission of liability by the Foundation or Employee, nor shall it be used as evidence of liability in any proceeding, except to enforce its terms.

15. **NARROWING; SEVERABILITY.** If any provision of this Agreement is found to be unlawful or unenforceable, it will be deemed narrowed to the extent required to make it lawful and enforceable. If such narrowing is not possible, any provision other than Section 4 will be severed from the Agreement and the remaining provisions will remain fully valid and enforceable to the maximum extent consistent with applicable law. In relation to Section 4, should a court, arbitrator, or agency conclude that a particular claim may not be released as a matter of law, it is the intention of the parties, and the parties hereby agree, that the release in Section 4, the waiver of unknown claims in Section 5, and the provisions of Section 6 will remain effective to release any and all claims other than those that may not be released as a matter of law.

16. **TAX COMPLIANCE.** This Agreement is intended to comply with the Internal Revenue Code of 1986, as amended, (the "**Code**") and will be construed and administered in accordance with the Code. Notwithstanding the foregoing, the Foundation makes no representations that the payments and benefits provided under this Agreement comply with the Code, including Code Section 409A. In no event will either party be liable to the other for any portion of any taxes, penalties, interest, or other expenses that may be incurred by the other party on account of any non-compliance.

17. **DISPUTE RESOLUTION.** Except for any claim by either party to seek injunctive relief arising out of a breach of a party's obligations to protect the other's proprietary information, the parties will submit to binding arbitration any and all disputes, claims, or controversies arising out of or related to Employee's hiring, employment, or termination, and/or the validity, enforceability, interpretation, performance, or breach of this Agreement, whether sounding in tort, contract, statutory violation, or otherwise, or involving the construction or application of any of the terms, provisions, or conditions of

44775\20564005.1                                8 of 11

Docusign Envelope ID: AB2D229F-0EF6-4F84-B04E-8FC8CC1B0AED

this Agreement. Arbitration before a sole neutral arbitrator will occur in Seattle, Washington. The arbitration will be administered by JAMS pursuant to its Employment Arbitration Rules & Procedures then in effect. This Agreement is intended to provide for arbitration on an individual basis as the sole and exclusive means for resolution of all disputes between the parties to the fullest extent permitted by law. The parties expressly waive any entitlement to have such controversies decided by a court or jury. Employee will not be liable for arbitration fees beyond those costs Employee would have incurred had a claim been filed in a court of competent jurisdiction. This dispute resolution provision may be enforced under the Federal Arbitration Act and/or similar relevant controlling state or local provisions. This Agreement will otherwise be governed by the laws of the State of Washington. This Agreement to arbitrate does not interfere with Protected Activity (as defined in Section 10.1) or apply to (a) unemployment or workers' compensation claims, (b) claims of sexual harassment or sexual assault, or (c) other matters that by the relevant controlling law cannot be arbitrated.

THIS SPACE INTENTIONALLY LEFT BLANK

AGREEMENT CONTINUES ON THE NEXT PAGE.

Docusign Envelope ID: AB2D229F-0EF6-4F84-B04E-8FC8CC1B0AED

18.    **KNOWING AND VOLUNTARY AGREEMENT.** Employee represents and warrants that Employee:

understands that this Agreement operates as a waiver of employment-related claims;

has carefully read this Agreement and finds that it is written in a manner that Employee understands;

knows the contents of this Agreement;

is and has been advised to and has had the opportunity to consult with Employee's personal attorney before signing this Agreement and has done so or has knowingly and voluntarily waived the right to do so;

understands that Employee is giving up all potential claims under the Age Discrimination in Employment Act and other discrimination statutes, except as provided in this Agreement;

has been advised that Employee is not barred from engaging in Protected Activity (as defined in Section 10.1);

has had at least 45 days to review and analyze this entire Agreement;

did not rely upon any representation or statement concerning the subject matter of this Agreement, except as expressly stated in the Agreement;

understands the Agreement's final and binding effect; and

has signed the Agreement as Employee's free and voluntary act.

EMPLOYEE

Shihwa Hwang-Meza

September 10, 2025
(Date)

GATES FOUNDATION

kelly Goff
(Signature)

Director, People Experience
(Title)

September 10, 2025

(Date)
P.O. Box 23350
Seattle, Washington 98102

Docusign Envelope ID: AB2D229F-0EF6-4F84-B04E-8FC8CC1B0AED

**Lawsuits, complaints, or charges (Section 6) are [*include name, cause number, and court or agency*]:**

_____

_____

_____